443 F.2d 1255
 In the Matter of ARGUS INDUSTRIES, INC., Bankrupt, Cal-Val Research and Development Corporation, Appellant,
v.
Manuel M. LIODAS, Trustee in Bankruptcy, Appellee.
Manuel M. LIODAS, Trustee in Bankruptcy, Cross-Appellant,
v.
CAL-VAL RESEARCH AND DEVELOPMENT CORPORATION, Cross-Appellee.
 No. 24741.
 No. 24984.
 United States Court of Appeals, Ninth Circuit.
 April 26, 1971.
 Rehearings Denied July 7, 1971.
 
 Charles H. Phillips (argued), John Gaims, of Irell & Manella, Century City, Los Angeles, Cal., for appellant Cal-Val.
 Timothy M. Thornton (argued), of Simon, Sheridan, Murphy, Thornton & Medvene, Los Angeles, Cal., Quittner, Stutman, Treister & Glatt, Los Angeles, Cal., for appellee.
 Before HAMLEY, BROWNING and ELY, Circuit Judges.
 HAMLEY, Circuit Judge:
 
 
 1
 This litigation arises out of a claim in bankruptcy, in the amount of $215,762.56, by Cal-Val Research and Development Corporation (Cal-Val), for goods sold and delivered under subcontracts to Argus Industries, Inc. (Argus), the bankrupt. The trustee in bankruptcy, Manuel M. Liodas, filed objections to the Cal-Val claim and a counterclaim for alleged breach of the same contracts. The referee disallowed Cal-Val's claim in its entirety and awarded judgment of $131,204.69 against Cal-Val on the trustee's counterclaim. The district court affirmed without modification. This appeal and cross-appeal followed.
 
 
 2
 The factual background of this suit is immensely complicated and we accordingly set forth below only a summary review of the essential facts, omitting much in the way of procedural developments and peripheral issues.
 
 
 3
 In June, 1963, Argus entered into contractual relationships with Cal-Val under which Cal-Val was to produce and deliver to Argus various bomb rack parts. The parts were required by Argus in connection with its contracts with the United States Air Force and the Northrop Corporation (Northrop) for the production of bomb racks.[1] The contractual relationships between Argus and Cal-Val were evidenced by a contract between them, dated June 14, 1963, a subsequent and substantially similar contract, an agreement, dated July 3, 1963, between Argus, Cal-Val and Peacock Engineering Company, and various Argus purchase orders.
 
 
 4
 It was understood from the outset that Argus would be financially unable to carry on the production of the bomb racks without extensive financial assistance. In recognition of this understanding, the contract of June 14, 1963 contains the recitals quoted in the margin.[2] Under the contract, Argus was not required to make any payments to Cal-Val for bomb rack parts until Argus had been paid for the related bomb racks by the Air Force or Northrop. Upon receiving payments from the Air Force or Northrop, there was to be a pro rata division of funds in accordance with a formula stated in paragraph 3 of the June 14 agreement.
 
 
 5
 The above-described written agreements were the subject of numerous oral modifications and adjustments with respect to delivery schedules. The parties stipulated that, up until December 5, 1963, all contractual problems were resolved by mutual agreement to the satisfaction of all parties. As the case reaches us, the critical factual question is what happened under the contract between December 6 and December 31, 1963.
 
 
 6
 The referee found that, during the period December 6, 1963 to December 31, 1963, Cal-Val failed to ship to Argus bomb rack parts which it had on hand available for shipment. In that month Rocket Power, Inc., a competitor of Argus and a subsidiary of Maremont Corporation, had acquired control of Cal-Val. Negotiations were then held between Argus and Cal-Val regarding the possible acquisition of Argus by Rocket Power and an assignment to Rocket Power of Argus' bomb rack contracts. However, no assignment or novation of the contracts could be agreed upon with the Air Force and Northrop. The referee inferred from the evidence that Cal-Val's failure to ship bomb rack parts to Argus beginning in late December, 1963, was pursuant to instructions from Cal-Val's new owner.
 
 
 7
 Because of its failure to receive bomb rack parts from Cal-Val during this period, the referee found, Argus totally collapsed as a going business on March 13, 1964. It was on that day that Northrop, pursuant to a claim and delivery action, seized Argus' inventory of parts for which Northrop had made progress payments. In April, 1964, the Air Force seized the Air Force inventory in the possession of Argus, and terminated the Air Force contract. The Argus bankruptcy proceedings were instituted on April 24, 1964.
 
 
 8
 In his amended findings of fact the referee found that Cal-Val had breached its contract with Argus by reason of its "false promises" to deliver, its failure to produce and deliver substantial quantities of parts during the period from December 6, 1963 to December 31, 1963, and its failure to ship according to a schedule established by past invoices. As before noted, the district court accepted these findings without change.
 
 
 9
 On this appeal, Cal-Val argues that these asserted breaches by Cal-Val were not in issue at the trial and that it is grossly unfair to deny Cal-Val's claim on grounds which were not in issue. In support of this position, Cal-Val relies upon a stipulation which was entered into early in the hearings before the referee. On that occasion, after the parties first stipulated that all controversies between the parties through December 5, 1963 had been settled, counsel for Cal-Val stated to the referee:
 
 
 10
 "Further stipulated that the trustee's sole contention under his breach of contract counter-claims as a basis for the breach subsequent to December 5th was that Cal-Val refused to continue to deliver and await to be paid from progress payments which were forthcoming to Argus but rather stopped delivery and insisted upon C.O.D. payments."
 
 Counsel for the trustee replied:
 
 11
 "I will accept your further stipulation on one additional condition. It was not only C.O.D. payments, but as I understand those telegrams, they were insisting on payment of all accounts receivable outstanding."
 
 
 12
 The referee stated that he would accept the stipulation. Cal-Val asserts that, thereafter it directed its defense to the charge that, beginning in December, 1963, Cal-Val made demands for payment C.O.D., and of all accounts receivable.
 
 
 13
 In response to this argument by Cal-Val, the trustee concedes that it would be reversible error to find the seller liable for breach of contract on grounds which were expressly removed from the issues in litigation. The trustee asserts, however that the stipulation quoted above was not intended to be a restriction on the legal issue of Cal-Val's failure to deliver. On the contrary, the trustee reasons, the thrust of the stipulation was to focus attention upon the events of December, 1963, and January and February, 1964, rather than to get involved in the numerous conversations and agreements in the six-month period from June, 1963 to December 5, 1963. The trustee points out that after the stipulation was entered into, the parties did focus their attention on the latter period.
 
 
 14
 The resolution of this controversy as to the meaning of the stipulation has not been easy for us. Both parties refer to related colloquy during the hearing which tends to support their respective positions. Since, however, the salient questions were whether Cal-Val had ceased deliveries of bomb rack parts after December 5, 1963 and, if so, whether the circumstances were such as to excuse Cal-Val from such performance, it seems almost inconceivable that the parties intended the stipulation to foreclose inquiry as to the real reason for non-delivery after that date.
 
 
 15
 Moreover, all of the issues on the basis of which the referee entered his amended findings and conclusions were fully explored during the hearings, without apparent objection at the hearings on the ground that they were excluded by the stipulation. Cal-Val has not attempted to document its assertion that had it known these broader issues were in the case, it would have presented other evidence.
 
 
 16
 We are not convinced that Cal-Val has been prejudiced in the presentation of its defenses by the failure of the referee to adjudicate the claim and cross-claim on the basis of Cal-Val's construction of the stipulation.
 
 
 17
 Cal-Val makes only a passing attack upon the referee's amended findings of fact to the effect that, during the December 5-December 31, 1963 period, Cal-Val had completed critical parts which it did not deliver to Argus. The evidence bearing on this point is in dispute. We do not believe that the referee's amended finding, accepted by the trial court, is clearly erroneous.
 
 
 18
 Cal-Val argues that the district court committed reversible error in disallowing a substantial credit found due from Argus to Cal-Val.
 
 
 19
 The credit, in the amount of $134,353.46, represents the undisputed total amount of parts delivered by Cal-Val to Argus, less the amounts paid by Argus to Cal-Val. Cal-Val argues that, even assuming that it breached its contract as found by the referee, it is entitled to a set-off in this amount as against Argus' counterclaim for damages resulting from the breach. Cal-Val calls attention to provisions of the Uniform Sales Act, particularly California Civil Code, section 1764[1] which governs this contract, and to California court decisions tending to support this view and calling for rejection of the doctrine of strict forfeiture. Cal-Val also refers to section 68, sub. a of the Bankruptcy Act, 11 U.S.C. § 108(a), pertaining to set-off requirements. Under this section the debts are to be set off where then owed, even though not presently due or as yet unliquidated. United States v. Brunner, 282 F.2d 535, 538 (10th Cir. 1960).
 
 
 20
 The court denied the offset because "the contract provided Cal-Val would be paid when Argus was paid." The reference here was to the contract provision to the effect that Argus was not required to make any payments to Cal-Val until Argus had been paid for the bomb racks in which the Cal-Val parts had been used. Argus has not been paid in full for the bomb racks in which these unpaid-for Cal-Val parts were incorporated.
 
 
 21
 Of this total credit, $83,841.71 represents the contract price of unpaid-for parts delivered by Cal-Val to Argus and incorporated into bomb racks which thereafter came into possession of the Air Force. Extensive administrative proceedings involving Argus' dealings with the Air Force are now in progress. These proceedings involve many issues unrelated to the Cal-Val-Argus controversy. Under all of the circumstances we believe that Cal-Val's credit in this amount ($83,841.71) should be set off now, by judicial decree, against the Argus counterclaim, without awaiting resolution of the Argus-Air Force problems. We are led to believe by what was said at oral argument that a firm judicial decree now, with respect to this set-off, may promote settlement of the Argus-Air Force matters.
 
 
 22
 The remainder of the $134,353.46 undisputed credit referred to above, represents the contract price of unpaid-for Cal-Val parts incorporated into bomb racks which later came into the possession of Northrop. There has been litigation between Northrop and the trustee involving payment for these bomb racks, and this litigation was settled in the Argus bankruptcy proceeding. We do not know whether this settlement included full payment by Northrop to the trustee for these bomb racks. If it did, then it would be unjust enrichment for the trustee not to set off Cal-Val's share of that payment against the Argus counterclaim.
 
 
 23
 But even if the settlement did not represent such full payment by Northrop, we perceive no reason why Cal-Val should be prejudiced by that circumstance. As in the case of the Air Force portion, we believe Cal-Val is now entitled to an offset in the amount of the undisputed credit attributable to Cal-Val parts utilized in assembling bomb racks, which came into the possession of Northrop.
 
 
 24
 The views expressed above accordingly call for modification of the district court judgment to provide Cal-Val with an off-set for the full $134,353.46 credit referred to above. As this credit exceeds the judgment awarded the trustee, this offset calls for the vacating of the award to the trustee and for the entry of judgment for Cal-Val in the amount of the excess credit.
 
 
 25
 The order appealed from includes an award of damages against Cal-Val in the amount of $2,481.48 as auctioneer's charges in auctioning Argus' general plant machinery and equipment which had been owned by Argus and which passed to the trustee by virtue of the bankruptcy. The district court also allowed a "loss" of $24,140.30, representing the difference between the fair market value of the machinery and equipment, and the amounts received therefor at the auction. Cal-Val argues that, assuming that Argus' failure is properly attributed to Cal-Val, these items of damage should not have been awarded against it. Cal-Val here invokes the rule limiting a plaintiff's recovery of losses to those which the defendant would have presumably consented to be responsible for, if the possibility of bearing such losses has been called to his attention at the time of making the contract.[3]
 
 
 26
 Bearing upon the matter of "presumable consent," Cal-Val asserts that the likelihood of Argus' bankruptcy was expressly recognized in the contract, and the agreed remedy for such bankruptcy (which Cal-Val and Argus actually attempted to effectuate) was to have Cal-Val take over and perform in place of Argus on the Northrop and Air Force contracts. In the light of this contemplated remedy for Argus' bankruptcy, Cal-Val argues, it would be inappropriate to award the items of damage described above.
 
 
 27
 Cal-Val concedes that these costs were obviously foreseeable. This being the case, it is immaterial that they were not the kind of costs that Cal-Val or Argus expected Cal-Val to bear in the event Argus went into bankruptcy. The latter eventuality is not all that happened here. Under the established findings, not only did Argus go bankrupt, but Cal-Val's failure to deliver parts was a substantial contributing cause of such bankruptcy. The contract provisions relating to remedies, upon which Cal-Val relies, were not made in contemplation of this additional circumstance.
 
 
 28
 It follows that those provisions do not limit the measure of relief to which the trustee, on behalf of Argus, is entitled. Absent such a limitation, and pursuant to California Civil Code, section 3300, it was a question for the trier of fact to determine what damages were, or reasonably should have been, in contemplation of the parties at the time of contracting. The referee's finding that the items of damage under discussion were within the contemplation of the parties is not questioned by Cal-Val and, in any event, has adequate support in the evidence.
 
 
 29
 Cal-Val next contends that damages in the amount of $104,582.91 were erroneously awarded against it based upon testimony that this amount of engineering costs was incurred in the development of Argus' bomb rack designs, drawings, engineering data and the like. Cal-Val argues that since these items passed to the trustee and were sold by him in a compromise with Northrop approved by the referee, and since it must be presumed that the trustee recovered full value for these items, there was no "loss" to be assessed against Cal-Val.
 
 
 30
 The first of these arguments, pertaining to the trustee's compromise settlement with Northrop, was not advanced in the proceedings before the referee. Had the point been raised in those proceedings, evidence could have been adduced which would have enabled the referee to determine its merits. It is true that the burden of proof on damages belongs to the trustee. He met that burden by showing the cost to Argus of these items. The burden was upon Cal-Val to discount that proof by evidence, if any, that the trustee had already recouped all or part of that cost as a result of his settlement with Northrop. Cal-Val did not assume this burden before the referee and we do not believe it is now entitled to a remand so that it may do so.
 
 
 31
 On his cross-appeal, the trustee argues that he should have been awarded damages for the value of bomb-rack tooling and certain litigation expense.
 
 
 32
 The referee declined to award damages for the tooling on the ground that Argus had not paid for the bomb-rack tooling by Cal-Val. The trustee contends that such tooling was paid for to the extent that the Air Force and Northrop had advanced progress payments for certain bomb racks which they had accepted. Further, the trustee asserts, under the contract, tooling would have been completely paid for had Cal-Val fulfilled its contract.
 
 
 33
 Under the contracts between Cal-Val and Argus, Argus was to pay Cal-Val for bomb-rack tooling gradually over the life of the contract. We agree with Cal-Val that this argument by the trustee is without merit because the contract was not completed, the trustee has never shown that Cal-Val received any funds for tooling, and Cal-Val remained the owner of the tooling.
 
 
 34
 With regard to the counterclaim for litigation expense, three items are in issue, as noted in the margin.[4] The trustee asserts that he has paid these items and that they were incurred as a result of the financial failure of Argus. Urging that these expenditures were necessary as a result of Cal-Val's breach of contract, the trustee contends that they were foreseeable within the meaning of California Civil Code, section 3300, and therefore collectible from Cal-Val as damages.
 
 
 35
 The referee's amended findings do not explain why these items of litigation expense were denied. As we understand it, however, the trustee charged the first two of these items to the Air Force and the reasonableness of the amounts is all that remains to be decided in the related administrative proceeding. Obviously, the trustee is not entitled to collect these expenses from both the Air Force and Cal-Val. The third item pertains to negotiations between the trustee and McDonnell Aircraft arising from the bankruptcy of Argus. Cal-Val had no connection, direct or indirect, with the business dealings between Argus and McDonnell Aircraft. We think it would be stretching "foreseeability" too far to hold that Cal-Val should have contemplated the likelihood of Argus incurring such an expense in the event Cal-Val breached its contract to deliver parts to Argus. The district court did not err in sustaining the determination of the referee that these litigation expenses should be disallowed.
 
 
 36
 The judgment is affirmed in part and reversed in part, and the cause is remanded to the district court for entry of an amended judgment consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 Cal-Val was the original subcontractor on the Air Force contract for bomb racks, and a substitute for Peacock Engineering on the Northrop contract
 
 
 [2]
 
 "a. Argus is not possessed of sufficient funds to carry on the complete production of the bomb racks, together with other business.
 "b. Cal-Val is possessed with adequate production facilities and has the approval of U.S.A.F. as a source of manufacture for the bomb racks.
 "c. Cal-Val has available to it certain lines of credit which it can make available to Argus."
 
 
 [3]
 See Globe Refining Co. v. Landa Cotton Oil Co., 190 U.S. 540, 23 S.Ct. 754, 47 L.Ed. 1171 (1903); California Press Mfg. Co. v. Stafford Packing Co., 192 Cal. 479, 221 P. 345 (1923); California Civil Code, section 3300.
 
 
 [4]
 "1. Jack Paul, an attorney specializing in administrative contractual proceedings before the government — $3,500 retainer fee paid in connection with matters pending before the Armed Services Board of Contract Appeals
 "2. Harry Popeney, a defense contract specialist in administrative proceedings retained by the trustee at an expense of $2,250 for proceedings pending before the Armed Services Board of Contract Appeals.
 "3. Harry Popeney retained in re negotiations with McDonnell Aircraft and paid the sum of $11,499.92; these amounts are set forth in Exhibits 86 and 87 received into evidence."