118 P.3d 29.

Christina URIAS, Receiver, and Mark D. Tharp, Special Deputy Receiver of Premier Healthcare, Inc., an Arizona insurance company, in receivership, Plaintiffs–Appellants,

v.

PCS HEALTH SYSTEMS, INC., a Delaware corporation; ADVANCEPCS, a Delaware corporation, Defendants–Appellees.

No. 1 CA–CV 03–0717.

Court of Appeals of Arizona, Division 1, Department B.

Aug. 18, 2005.

Glover & Van Cott, P.A. By Michael R. Glover, Joyce N. Van Cott, Phoenix, Attorneys for Plaintiffs–Appellants.

Mariscal Weeks McIntyre & Friedlander, P.A. By Timothy J. Thomason, Robert C. Brown, Phoenix, Attorneys for Defendants–Appellees.

## OPINION

GEMMILL, Judge.

¶ 1 Premier Healthcare, Inc., an insurer, owed money to PCS Health Systems, Inc. for

prescription drug reimbursement payments. PCS had gathered volume discount rebates from drug manufacturers and was obligated to pay eighty-five percent of the rebates to Premier. After Premier was placed into receivership, PCS asserted the right under Arizona Revised Statutes ("A.R.S.") section 20–638(A) (2002) to retain the rebate funds owed to Premier as an offset against Premier's indebtedness to PCS. To decide whether this offset is authorized, we must determine if the obligations were "mutual debts" within the meaning of A.R.S. § 20–638(A). Because we decide that the obligations were "mutual debts" and may be set off in accordance with § 20–638(A), we affirm the summary judgment granted in favor of PCS against Premier.[1]

## FACTS AND PROCEDURAL BACKGROUND

¶ 2 Premier operated as an Arizona health care services organization offering health insurance plans to employer groups and Medicare-eligible individuals (collectively its "Members"). These plans included certain prescription drugs. To fulfill its prescription drug services obligation, Premier entered into a Managed Pharmaceutical Benefit Agreement (the "Agreement") with PCS. Under the Agreement, PCS provided services that included pharmacy management, claims processing, drug utilization review, and formulary services. The Agreement established a fee schedule for the various services provided by PCS.

¶ 3 The pharmacy management services provided by PCS included access for Premier's Members to pharmacies under contract to PCS that had agreed to perform pharmacy services in accordance with the reimbursement schedule and other "processing parameters" established by Premier. PCS agreed to process claims submitted by its network pharmacies and by Premier Members directly. The Agreement provided that the dispensing pharmacy must collect any applicable copayments or coinsurance or deductibles from the Member and that "PCS will pay the dispensing pharmacy the balance, if any, of the agreed upon reimbursement amount."

¶ 4 Section 3.2 of the Agreement established the method for reimbursement by Premier for pharmaceutical benefits provided to Premier's members:

> **Drug Reimbursement.** When, as part of the Services, PCS reimburses Network Pharmacies or Members in connection with Benefits, Premier shall pay to PCS all amounts disbursed or to be disbursed by PCS. PCS shall establish a payment cycle for reimbursement of Network Pharmacies for Benefits provided to Members. . . . Following each cycle, PCS shall send to Premier via facsimile an advice specifying the charges applicable to such cycle. Premier shall wire that amount within 48 hours to the bank account designated by PCS and established for that purpose.

PCS generally did not pay claims to the pharmacies until PCS had received payment from its customers such as Premier.

¶ 5 In addition to the pharmacy management services, the Agreement required PCS to provide a "formulary service." This service included development of a drug formulary and the performance of a retrospective review of drug utilization and prescribing patterns in order to obtain rebates from drug manufacturers. Section D of the formulary services component of the Agreement provided:

> **Rebate Contracts.** PCS will attempt to contract with certain manufacturers for volume rebate programs. Premier acknowledges that whether and to what extent manufacturers are willing to provide rebates will depend upon the Plan design adopted by Premier, and other aspects of Premier's drug benefit program, as well as PCS receiving sufficient information regarding each claim submitted to manufacturers for rebates.

---

1. This action was initiated by the Receiver and Special Deputy Receiver of Premier Healthcare, Inc. We use "Premier" to refer to Premier Healthcare, Inc. prior to the commencement of receivership and to the Receiver and Special Deputy Receiver after receivership, unless the context requires otherwise. Also, AdvancePCS is the successor to PCS Health Systems, Inc. and we refer to them individually and jointly simply as "PCS."

¶ 6 In return for the agreement by PCS to attempt to negotiate these rebates, Premier agreed not to participate "in any other formulary or similar volume discount program during the term of the Agreement." Premier also agreed not to enter into any direct contracts with pharmaceutical manufacturers for volume discounts during the term of the Agreement or for one year from termination of the Agreement.

¶ 7 The term "rebate" was defined as "all rebates, reimbursements or other discounts received under a Manufacturer's discount program with respect to pharmaceutical products dispensed to a Member under the Plan," but was not to include "any fees or other compensation" paid by the manufacturer to PCS for its own account for administrative or other fees. PCS was required to report annually to Premier regarding the administrative fees paid to PCS by each manufacturer with respect to the pharmaceutical products dispensed to Premier's members.

¶ 8 The rebate services portion of the Agreement also provided:

On behalf of Premier, PCS will receive the Rebates paid by manufacturers to Premier. PCS will make payments of such Rebates once each calendar quarter as follows: within 60 days of the beginning of each quarter, PCS will pay to Premier all Rebates received by PCS during the prior quarter.

Along with each payment of Premier Rebates, PCS will provide a report which includes the Manufacturer's name, the number of prescriptions and/or amount of dollar purchases for each Manufacturer, and the total amount of Rebates paid by each Manufacturer.

Premier did not control the manner in which PCS negotiated and secured the rebates. Premier was given the right, however, to audit the volume discount contracts from the manufacturers from time to time at its own expense. Premier "acknowledge[d] and agree[d] that PCS will not be responsible in any manner for any failure of any Manufacturer to pay any Rebate."

¶ 9 The fee to be paid to PCS for its formulary services, including "the negotia-

tion, collection and distribution of rebates," was fifteen percent of the rebates collected by PCS. In agreeing to this amount, Premier acknowledged that it "received and considered an estimate of the potential range of Rebates under its Plan." Premier also agreed that PCS could retain its fifteen percent fee from any rebates "collected by PCS on behalf of Premier in connection with this Agreement."

¶ 10 To summarize, the PCS network pharmacies bought pharmaceuticals from manufacturers, provided those pharmaceuticals to Premier Members, and submitted claims at intervals to PCS, which, in turn, invoiced Premier. Premier paid PCS "within 48 hours" and PCS then paid its network pharmacies. PCS gathered information regarding the dollar amount or number of prescriptions attributable to the purchase of pharmaceuticals for Premier Members from various manufacturers and used this information to negotiate rebates or volume discounts from those manufacturers participating in a rebate program. PCS collected these rebate funds and remitted them to Premier at quarterly intervals, minus PCS's fifteen percent fee. PCS maintained separate accounting for the collection and remittance of rebate funds.

¶ 11 This arrangement continued with apparent satisfaction on all fronts until Premier was placed in receivership for insolvency on November 16, 1999. As of that date Premier had paid all PCS drug reimbursement billings except for three billing cycles between October 23, 1999 and November 15, 1999. When Premier was placed in receivership, PCS was holding funds collected from manufacturers under the rebate program and PCS continued to receive additional rebate payments for a period of time thereafter.

¶ 12 The receivership commenced during the fourth quarter of 1999. PCS was not required to remit rebate funds to Premier for the third quarter of 1999, which ended September 30, until sixty days after October 1. Therefore, on November 16, 1999, rebate funds received on behalf of Premier in the third quarter were not yet overdue, and the total rebates to be collected by PCS in the

fourth quarter could not yet be determined.[2] According to PCS, the total amount of rebates it had collected at the time of the summary judgment proceedings was $1,151,918.06. The calculations of Premier's Receiver put this amount slightly higher, at $1,156,044.00.

¶ 13 On November 18, 1999, two days after Premier was placed into receivership, PCS sent its network pharmacies notice of the receivership and informed the pharmacies that PCS had not received funds from Premier for payment to pharmacies for claims submitted from October 23, 1999, to the present. The notice to the network pharmacies further explained:

> As you are aware, PCS generally does not pay claims to pharmacies until PCS receives payment from its customers. Nevertheless, with respect to claims that your pharmacy submitted to PCS for Premier members between October 23, 1999 and November 5, 1999 [known as "cycle 923"], PCS will prepay your pharmacy for those claims even though it has not yet received payment from Premier.... PCS believes that certain rights exist that will allow PCS to collect most, if not all, of the money due to pharmacies for this time period. In the event PCS is unsuccessful in these efforts, future reimbursements may be adjusted accordingly to offset amounts not received from Premier.

The total amount paid by PCS to the pharmacies for cycle 923 was $1,089,367.00. PCS informed the network pharmacies that it did not intend to pay the charges for the succeeding cycles unless and until funds were received by PCS through the receivership for those claims.

¶ 14 In December 2000, PCS filed a proof of claim in the Premier receivership for drug reimbursements in the amount of $1,877,489.20, an amount that included cycle 923 and additional reimbursements that had accrued between November 5 and November 15, 1999. PCS represented in its proof of claim that it was entitled to retain the rebate monies it was holding to offset the amount of its claim.[3] Premier's Receiver allowed PCS's claim as a general creditor of the estate. Ultimately, the Receiver indicated that Premier's assets were only sufficient to pay a relatively small percentage of the claims of general creditors.

¶ 15 PCS retained the rebate funds to offset its claims against Premier. Alleging that PCS had breached its contract by refusing to pay Premier the rebate funds, Premier filed this action to recover the unpaid funds.

¶ 16 The parties filed simultaneous motions for summary judgment. PCS relied on A.R.S. § 20–638 and a common law right of setoff to support its retention of the rebate funds as an offset against the money owed by Premier to PCS. Section 20–638, entitled "Offsets," is part of an article within our state insurance statutes governing the rehabilitation and liquidation of insolvent insurers. *See* A.R.S. § 20–638. Subsection (A) provides:

> In all cases of *mutual debts or mutual credits between the insurer and another person* in connection with any action or proceeding under this article, *such credits and debts shall be set off and the balance only shall be allowed or paid,* except as provided in subsection B of this section.

A.R.S. § 20–638(A) (emphasis added). PCS contended that the amounts owing from Pre-

---

2. The amount of rebates expected for any given period could not be determined precisely in advance. PCS invoiced the manufacturers based upon estimated rebate amounts. The actual manufacturer payments could vary depending upon drug pricing and differences in contract interpretation between each manufacturer and PCS. Rebate distributions to Premier were based upon the timing of payments received by PCS from the manufacturers. For example, invoices for fourth-quarter 1999 rebates were not sent to the manufacturers until the beginning of March 2000, and the first distributions for that period were not expected until the end of May 2000.

3. Premier asserts that the PCS decision to prepay cycle 923 was a deliberate attempt to shore up its claim to an offset from the rebate funds it was holding because the two amounts were roughly equal; that is, PCS claimed $1.1 million for drug reimbursement and had $1.15 million in hand from rebates. Premier points out that PCS said as much in its notice to the pharmacies when it referred to certain "rights" that would allow PCS to collect these sums from Premier.

mier for drug reimbursements and the amounts being held by PCS for manufacturer drug rebates were mutual debts that could be offset under this statute.

¶ 17 Premier argued that the rebate funds belonged to Premier, were being wrongfully withheld by PCS, and could not be offset because there was no mutuality of obligation. Premier contended that PCS held the rebate funds as an agent, trustee, or fiduciary of Premier and therefore PCS's obligation to pay the funds was not "mutual" with the obligation of Premier to reimburse PCS for pharmaceutical claims.

¶ 18 PCS denied that it was Premier's agent, trustee, or fiduciary with respect to the rebates and asserted that its obligation to Premier was a simple contractual one of debt, not one of trust or agency. PCS relied on language in the Agreement that provides that the parties are "independent contractors" and that "they shall have no other legal relationship under or in connection with this Agreement."

¶ 19 The trial judge granted summary judgment to PCS. He found the determinative question was whether "mutuality" of capacity and obligation existed between the parties and concluded that the authorities cited by PCS established there was "no agency or fiduciary relationship here sufficient to overcome a finding of mutuality of capacity and obligation." Judgment was entered in favor of PCS allowing the setoff, and this timely appeal followed. We have jurisdiction pursuant to A.R.S. sections 12–120.21(A)(3) (2003) and –2101(B) (2003).

## ANALYSIS

■ ¶ 20 The issue Premier presents for our review is whether the trial court erred as a matter of law in determining that PCS was entitled to offset the rebate funds it was holding against its claim for drug reimbursement expense. We review the grant of summary judgment *de novo* to determine whether any genuine issues of material fact exist and whether the trial court correctly applied the law. *See Bentivegna v. Powers Steel & Wire Prods., Inc.*, 206 Ariz. 581, 584, ¶ 10, 81 P.3d 1040, 1043 (App.2003).

¶ 21 The right of offset, or setoff, allows entities owing each other money to apply their mutual debts against each other, thereby avoiding "the absurdity of making A pay B when B owes A." *Citizens Bank v. Strumpf*, 516 U.S. 16, 18, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995) (quoting *Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 528, 33 S.Ct. 806, 57 L.Ed. 1313 (1913)). To qualify for offset under A.R.S. § 20–638(A), the obligations must be "mutual debts." The requisites for mutuality are not defined in our insurance company receivership statutes, and the parties have not cited nor have we found any Arizona appellate decision interpreting "mutual debts" in this context.

¶ 22 If the legislature has not defined a word or phrase in a statute, we will consider respected dictionary definitions. *See State v. Wise*, 137 Ariz. 468, 470 n. 3, 671 P.2d 909, 911 n. 3 (1983). We will also consider whether the word or phrase has an accepted common law meaning. *See* A.R.S. § 1–201 (2002) (adopting common law so far as it is consistent with Arizona's constitution, laws, or established customs of the people); *see also Pleak v. Entrada Prop. Owners' Ass'n*, 207 Ariz. 418, 422, ¶ 12, 87 P.3d 831, 835 (2004) ("Absent a clear manifestation of legislative intent to abrogate the common law, we interpret statutes with 'every intendment in favor of consistency with the common law.' ") (quoting *In re Thelen's Estate*, 9 Ariz.App. 157, 160–61, 450 P.2d 123, 126–27 (1969)).

¶ 23 The term "mutual" commonly means reciprocal. *See* Black's Law Dictionary 1039 (7th ed.1999). A "debt" in this context means a sum of money due another. *Id.* at 410. The phrase "mutual debts" has been defined as "[c]ross-debts of the same kind and quality between two persons." *Id.* at 411. An oft-repeated common law definition was stated by Judge Cardozo in 1920: "To be mutual, [the debts] must be due to and from the same persons in the same capacity." *Beecher v. Peter A. Vogt Mfg. Co.*, 227 N.Y. 468, 125 N.E. 831, 833 (1920) (citing *Dale v. Cooke*, 4 Johns. Ch. 11 (1819)). *See also Prudential Reinsurance Co. v. Superior Court (Garamendi)*, 3 Cal.4th 1118, 14 Cal. Rptr.2d 749, 842 P.2d 48, 53 (1992) (citing *Beecher*, 125 N.E. at 831); *Farmers' Bank &*

*Trust Co.'s Receiver v. Brown,* 249 Ky. 820, 61 S.W.2d 628, 628 (1933) (acknowledging debts must be reciprocally owed between the same parties and in the same capacity to be set off); *accord Comm'r of Ins. v. Munich Am. Reinsurance Co.,* 429 Mass. 140, 706 N.E.2d 694, 696 (1999); *Bank of Crab Orchard v. Myers,* 120 Neb. 84, 231 N.W. 513, 515 (1930); *Hampton Roads Fire & Marine Ins. Co. v. Coburn Motor Car Co.,* 158 Va. 675, 164 S.E. 723, 726 (1932).

¶ 24 Case law interpreting the analogous bankruptcy statute, 11 U.S.C. § 553 (1984), is also instructive and provides that mutuality exists if the debt is owed in the same right and between the same parties, standing in the same capacity. *See In re Westchester Structures, Inc.,* 181 B.R. 730, 739 (Bankr. S.D.N.Y.1995); *Photo Mechanical Servs., Inc. v. E.I. Dupont De Nemours & Co.,* 179 B.R. 604, 615 (Bankr.D.Minn.1995).

¶ 25 On the basis of these authorities, we hold that debts may be offset under A.R.S. § 20–638(A) as "mutual debts" if the obligations are due to and from the same parties in the same capacities.

### Same Parties

¶ 26 Premier initially contends that mutuality is lacking because its obligation for drug reimbursement was owed to the network pharmacies, not to PCS. The interpretation of a contract is a question of law for this court if the contract terms are plain and unambiguous. *See Chandler Med. Bldg. Partners v. Chandler Dental Group,* 175 Ariz. 273, 277, 855 P.2d 787, 791 (App.1993). We disagree with Premier because its contractual obligation under the Agreement ran directly to PCS. Section 3.2 of the Agreement required Premier to pay to PCS all "amounts disbursed *or to be disbursed* by PCS" in connection with claims for pharmacy benefits to Premier members. (Emphasis added.) PCS was authorized to "establish a payment cycle for reimbursement" and advise Premier "via facsimile" of the "charges applicable" to such cycle, after which Premier was obliged to remit by wire "within 48

hours." The Agreement obligated PCS, not Premier, to pay the dispensing pharmacies and did not require PCS to prepay network pharmacy claims as a condition precedent to payment by Premier.[4]

¶ 27 To be mutual and therefore eligible to be set off, the obligations must be reciprocally owed between the same parties. See *supra* ¶¶ 22–25. If, as here, the reciprocal obligations of the mutual debtors arise out of the same contract, the requirement of "same parties" will typically be satisfied.

¶ 28 Premier's drug reimbursement obligation was owed to PCS, and PCS owed rebate funds to Premier. The obligations were owed between the "same parties."

### Same Capacity

¶ 29 Premier further contends that the obligations were not owed in the same capacity because PCS was a general creditor of Premier with respect to drug reimbursements but PCS acted in the capacity of an agent, trustee, or fiduciary on behalf of Premier when collecting and forwarding the rebate funds. We must therefore decide whether the Agreement imposed upon PCS any special duties that transformed PCS from an ordinary contracting party into an agent, trustee, or fiduciary.

¶ 30 As we recognized when considering the requirement of "same parties," PCS's obligation to collect and pay rebate funds to Premier arises out of the same contract as Premier's obligation to make drug reimbursement payments to PCS. If reciprocal obligations arise out of the same contract, it is more likely that the obligations will be owed in the same capacity. In *McReynolds v. Cherokee Insurance Co.,* 815 S.W.2d 201 (Tenn.Ct.App.1990), the court rejected the argument of an insurance company receiver that the insurance agents had dealt with the insurer in two different capacities, "collecting agent for premiums and creditor as to profit share." *Id.* at 207. Emphasizing that the "agency agreement and the profit sharing agreement were part and parcel of the same

---

4. Because of our resolution of this issue, we do not reach PCS's argument that Premier is judicially estopped to deny that its drug reimbursement obligation was owed to PCS because Premier's Receiver accepted PCS's claim against Premier's estate.

contract" and part of the mutual consideration therefor, the court held that the insurer and these agents had acted in the same capacity. *Id.*

¶ 31 Moreover, if the reciprocal obligations arise out of the same contract and the parties have expressly characterized their legal relationship, such characterization will be persuasive on the issue of the parties' capacities. *See Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 152, 854 P.2d 1134, 1138 (1993) (indicating that we "attempt to enforce a contract according to the parties' intent"). The Agreement between Premier and PCS provides that the parties are "independent contractors" and that "they shall have no other legal relationship under or in connection with this Agreement." This language strongly supports PCS's position that the obligations were owed by each in the same capacity, as independent contracting parties.

¶ 32 Rather than creating a fiduciary relationship, the Agreement created a contractual arrangement whereby PCS agreed to perform services and Premier agreed to pay for those services. *See In re Koreag*, 961 F.2d 341, 353 (2nd Cir.1992) ("Purely commercial transactions do not give rise to a fiduciary relationship."). A commercial contract creates a fiduciary relationship only when one party agrees to serve in a fiduciary capacity. *See Morgan v. Am. Fid. Fire Ins. Co.*, 210 F.2d 53, 54–56 (8th Cir.1954) (holding that agent of insurer held collected premiums in a fiduciary capacity because agency agreement stated that agent was to receive and hold premiums "in a fiduciary capacity as trustee for" the insurer); *see also Am. Nat'l Bank v. Nat'l Indem. Co.*, 222 F.2d 513, 516–17 (8th Cir.1955) (finding express trust created when parties used language "[a]ll moneys ... shall be held by ... the agent as a fiduciary trust for and on behalf of the Company"). The Agreement between PCS and Premier specified that the parties were independent contractors and did not purport to create a fiduciary relationship. If Premier had intended to create a fiduciary relationship, it could have negotiated for specific language in the Agreement to that effect. The Agreement does not contain such language.

¶ 33 Premier contends that the language in Section 9(F) of the Agreement—stating that PCS would receive rebates "[o]n behalf of Premier"—demonstrates that PCS was Premier's agent and thus owed Premier a fiduciary duty to turn over the collected rebate funds. The mere fact that funds are collected "on behalf of" another party does not, however, create a fiduciary relationship. For example, in *Rodgers v. Roulette Records, Inc.*, 677 F.Supp. 731 (S.D.N.Y.1988), the court stated that the fact that a recording company collected royalties or fees that it was obligated to pass on to the recording artist did not make the recording company the artist's fiduciary. *Id.* at 739. The *Rodgers* court determined that although the funds were collected "on behalf of" the artist and there was an obligation to pay those funds to the artist, the contract did not create a fiduciary arrangement. *Id.; see also McReynolds*, 815 S.W.2d at 206–07 (holding that insurance agents could retain and set off the premiums owed to the insurer against profit shares owed by the insurer to the agents, despite the fact that the agents received premiums on behalf of the insurer).

¶ 34 Similarly, in *Sanshoe Trading Corp. v. Mitsubishi Int'l Corp.*, 122 Misc.2d 585, 470 N.Y.S.2d 991, 993 (Sup.Ct.1984), *aff'd*, 104 A.D.2d 337, 479 N.Y.S.2d 149 (1984), the court held that a fiduciary relationship regarding funds collected did not exist between a sales agent and the company for whom the agent made sales, even though the company collected money that it had an obligation to pay to the agent. As the court noted, "[t]he mere fact that the proceeds from the sale of the footwear were collected and were to be distributed by the defendants ... does not make the defendants fiduciaries." *Id.*

¶ 35 PCS was not acting as a fiduciary on behalf of Premier. The parties entered into an ordinary contractual relationship. The fact that the rebates were collected by PCS "on behalf of" Premier did not change the capacity in which PCS acted. The rebate funds represented an obligation that made PCS a debtor of, not a fiduciary to, Premier. *See Downey v. Humphreys*, 102 Cal.App.2d 323, 227 P.2d 484, 490 (1951) (describing the obligation to pay money as a debt and stating

that "[a] debt is not a trust" and does not create a fiduciary relationship).

¶ 36 Premier also argues that mutual capacity was lacking because PCS's obligation to collect and pay rebate funds to Premier created an agency relationship. PCS does not dispute that it was contractually obligated to pay the rebate funds to Premier after subtracting its fifteen percent fee. But PCS insists that the obligation was simply an ordinary debt.

¶ 37 The party asserting an agency relationship has the burden of proving it. *Salt River Valley Water Users' Ass'n v. Giglio*, 113 Ariz. 190, 195, 549 P.2d 162, 167 (1976); *Brown v. Ariz. Dep't of Real Estate*, 181 Ariz. 320, 326, 890 P.2d 615, 621 (App. 1995). Agency is a question of intent and generally the agent must be acting under the control of the principal and for the principal's benefit. *Salt River Valley Water Users' Ass'n*, 113 Ariz. at 195, 549 P.2d at 167.

¶ 38 In determining whether an agency relationship existed between two parties, a court must find that the principal had the right to control the purported agent's conduct for the transaction at issue. We must consider whether Premier had the right to control the manner in which PCS negotiated and collected the rebates. *See Valley Nat'l Bank v. Milmoe*, 74 Ariz. 290, 295–96, 248 P.2d 740, 743 (1952); *Nava v. Truly Nolen Exterminating*, 140 Ariz. 497, 500, 683 P.2d 296, 299 (App.1984) (stating that "[r]eservation by the asserted 'principal' of the right to control the transaction is essential to the existence of an agency relationship"); *see also* Restatement (Second) of Agency § 1 (1958) (defining agency as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control").

¶ 39 Premier acknowledges that PCS was not subject to Premier's control in regard to its efforts to acquire rebates. The declaration of Lisa Schuldes, a representative of PCS, confirms:

Under the Agreement, [PCS] arranged the rebate programs with drug manufacturers. In that regard, [PCS] took the steps it felt [were] appropriate to secure rebates. Premier did not dictate how [PCS] secured such rebates and did not control the manner in which [PCS] secured such rebates. Rather, [PCS] acted on its own accord and utilized the methods that it felt [were] appropriate in securing such rebates. Again, Premier did not control how [PCS] went about securing rebates.

¶ 40 Premier emphasizes that once the rebates were acquired, PCS lacked any discretion and was obligated to turn over the funds. We recognize, however, that contractual obligations to deliver property or goods to another are often considered debts for purposes of setoff. *See In re Bevill, Bresler & Schulman Asset Mgmt.*, 896 F.2d 54, 59 (3rd Cir.1990) (stating that "contractual obligations are debts for purposes of setoff" when one party is obligated to turn property over to another party); *In re Energy Coop., Inc.*, 814 F.2d 1226, 1232–33 (7th Cir.1987) (determining that debt could have been set off against creditor's claim for payment due on exchange agreement if creditor failed to deliver oil to debtor under oil exchange contract); *Argus Industries, Inc. v. Liodas*, 443 F.2d 1255, 1259 (9th Cir.1971) (recognizing creditor's failure to deliver goods to debtor as required by contract is a debt that may be offset against creditor's claim for payment on contract). Neither an agency nor a fiduciary relationship is created simply because one party is obligated to turn property over to another party.

¶ 41 Because of the absence of language in the Agreement creating an agency relationship and the lack of control by Premier over PCS's efforts to obtain the rebates, we conclude that an agency relationship did not exist between Premier and PCS with respect to PCS's obligation to pay rebate funds to Premier. Additionally, for the same reasons that PCS is not a fiduciary to or an agent of Premier, we also conclude that PCS is not a trustee in relation to Premier.

¶ 42 PCS owed money to Premier under the Agreement, and Premier in turn owed money to PCS under the Agreement. Because these reciprocal obligations were owed by the same parties in the same capacity, they constituted "mutual debts" under A.R.S.

§ 20–638(A) and PCS was entitled to retain the rebate funds as an offset against the money owed to PCS by Premier.

## Premier's Argument That PCS Improperly "Purchased" The Drug Reimbursement Claims

¶ 43 Finally, citing A.R.S. § 20–638(B), Premier asserts that PCS is not entitled to an offset under § 20–638(A) because PCS, in effect, "purchased" the drug reimbursement cycle 923 claims from the network pharmacies when PCS deviated from its usual practice and paid these claims without first receiving payment from Premier. The pertinent portion of subsection (B) provides:

> B. No offset shall be allowed in favor of any such person where ... the obligation of the insurer to such person was purchased by or transferred to such person with a view of its being used as an offset....

A.R.S. § 20–638(B). Premier's argument is flawed because PCS did not purchase or receive by transfer the drug reimbursement claim for cycle 923 expenditures. As explained previously, Premier's drug reimbursement obligation was owed to PCS no matter whether PCS had already paid the pharmacies. That PCS deviated from its customary practice of receiving payment from Premier before paying the pharmacies does not change the fact that Premier owed PCS for the cycle 923 claims both before and after PCS paid the pharmacies.

### CONCLUSION

¶ 44 For these reasons, PCS was entitled to retain the rebate funds as an offset against the debt owed by Premier, and the trial court correctly granted summary judgment to PCS.

¶ 45 PCS requests reasonable attorneys' fees on appeal in accordance with A.R.S. § 12–341.01 (2003). This dispute arises out of a contract and in our discretion we grant PCS's request for an award of fees on appeal, in an amount to be determined after PCS has complied with Arizona Rule of Civil Appellate Procedure 21(c).

¶ 46 The judgment of the trial court is affirmed.

CONCURRING: JEFFERSON L. LANKFORD, Presiding Judge, and JAMES B. SULT, Judge.

