234 P.3d 633

RIGEL CORPORATION, a Nebraska corporation that is qualified to do business in Arizona as Aksarben Pizza Corporation dba Krispy Kreme, Plaintiff–Appellant,

v.

STATE of Arizona; Arizona Department of Revenue, Defendants–Appellees.

No. 1 CA–TX 08–0006.

Court of Appeals of Arizona,
Division 1, Department T.

July 22, 2010.

Cavanagh Law Firm By Jeffrey B. Smith, Peter C. Guild, Phoenix, Attorneys for Plaintiff–Appellant.

Terry Goddard, Attorney General By Kimberly J. Cygan, Assistant Attorney General, Lisa A. Neuville, Phoenix, Attorneys for Defendants–Appellees.

## OPINION

GEMMILL, Judge.

¶ 1 Rigel Corporation, doing business as Krispy Kreme ("Rigel"), appeals an Arizona Tax Court ruling holding Rigel liable for transaction privilege taxes under the retail classification. *See* Ariz.Rev.Stat. § 42–5061(A) (Supp.2009).[1] The issue presented is whether Rigel is a qualified retailer, exempt from the transaction privilege tax, under one or more of the enumerated exceptions in Arizona Revised Statutes ("A.R.S.") section 42–5102(A) (2006). The tax court concluded that Rigel did not come within any of these exceptions to taxation, and we agree.

¶ 2 Additionally, the Arizona Department of Revenue ("Department") challenges the tax court's rejection of a deliberative process privilege regarding certain documents and evidence. We agree with the tax court that this privilege does not exist under Arizona law.

¶ 3 We therefore affirm the judgment of the Arizona Tax Court in its entirety.

## FACTS AND PROCEDURAL BACKGROUND

¶ 4 Between June 1, 1999 and April 30, 2004, Rigel sold doughnuts to the general public in Arizona.[2] At least 75 percent of its doughnut sales to the public were in quantities of a dozen or more and were boxed "to go." This percentage did not include Rigel's "wholesale" doughnut sales to retail vendors.

¶ 5 Rigel did not ask its customers where they intended to eat the doughnuts, and the

---

1. This statute, as amended in 2008, applies retroactively to taxable periods beginning from and after December 31, 1999. 2008 Ariz. Sess. Laws, ch. 194, § 5. The statute was amended again in 2010. The 2010 amendments, however, do not impact any issues in this appeal.

2. Rigel also sold beverages and promotional items.

doughnuts were placed in boxes or bags when sold. Rigel provided tables and chairs at each of its Arizona franchise locations for the estimated 5 percent of those customers who chose to consume the doughnuts on the premises.

¶ 6 Rigel also maintained cash registers with keys for recording all sales of a dozen or more doughnuts. Rigel's clerks were required to use these keys to implement the policy of providing a $1 discount for all sales of a dozen or more doughnuts. With the exception of its "wholesale" transactions, Rigel added a transaction privilege tax component to the price it charged its customers for doughnuts, whether they bought one doughnut, a dozen, or more.

¶ 7 Rigel made approximately 50 percent of its total retail sales at its drive-through windows. It recorded these sales on cash registers dedicated to such window sales, and did not use these registers for its walk-up retail business.

¶ 8 The Department assessed Arizona transaction privilege taxes on Rigel's take-out and on-premises consumption sales. Rigel responded by filing a series of refund claims for transaction privilege taxes. The last amended refund claim, filed on June 2, 2004, requested $2,332,393.15 for the June 1999 to April 2004 period. When the Department denied the claims, Rigel filed an unsuccessful protest with the Office of Administrative Hearings in accordance with A.R.S. §§ 42–1119 to –1251 (2006 & Supp.2008).[3]

¶ 9 Rigel then appealed to the tax court pursuant to A.R.S. § 42–1254(C) (2006). The parties litigated whether the deliberative process privilege shielded some of the Department's documents from production. These documents included memos to the Department's "Uniformity Committee" regarding policy on the food tax exemption and notes from a 1999 Uniformity Committee meeting. The tax court granted Rigel's motion to compel, and this court declined to exercise jurisdiction over the Department's ensuing petition for special action challenging the tax court's ruling.

¶ 10 Meanwhile, the parties cross-moved for partial summary judgment on the application of the exemption statute. The tax court ruled in the Department's favor, denied the refund claims, and entered judgment for additional tax and accrued interest of $121,743.45.[4] This appeal followed.

## RIGEL IS NOT A QUALIFIED RETAILER EXEMPT FROM THE ARIZONA TRANSACTION PRIVILEGE TAX

¶ 11 This court reviews the tax court's grant of summary judgment de novo. *Wilderness World, Inc. v. Ariz. Dep't of Revenue*, 182 Ariz. 196, 198, 895 P.2d 108, 110 (1995). We likewise review de novo the tax court's construction of statutes and findings that combine fact and law, but review its factual findings for clear error. *Ariz. Dep't of Revenue v. Ormond Builders, Inc.*, 216 Ariz. 379, 383, ¶ 15, 166 P.3d 934, 938 (App. 2007).

¶ 12 Arizona levies "privilege taxes measured by the amount or volume of business transacted by persons on account of their business activities." A.R.S. § 42–5008(A) (2006). The transaction privilege tax is akin to a sales tax with two differences: (1) the transaction privilege tax is levied on gross receipts instead of individual sales, and (2) the transaction privilege tax is levied on the seller, whereas a sales tax may be levied directly upon the buyer. *See Tower Plaza Invs. Ltd. v. DeWitt*, 109 Ariz. 248, 250, 508 P.2d 324, 326 (1973) (the transaction privilege tax is imposed on gross revenues instead of on individual transactions); *Ariz. Dep't of Revenue v. Action Marine, Inc.*, 218 Ariz.

---

**3.** During the administrative process, Rigel claimed that it was an eligible grocery business under A.R.S. § 42–5102(A)(1) (2006) and later contended in the tax court that the Department had violated the equal protection clause. Rigel has not raised these arguments on appeal, and we therefore consider them waived and do not address them. *See Nelson v. Rice*, 198 Ariz. 563, 567 n. 3, ¶ 11, 12 P.3d 238, 242 n. 3 (App.2000).

**4.** Rigel stipulated to judgment regarding additional transaction privilege tax exemptions it had claimed on some wholesale transactions and on machinery and equipment used in a manufacturing operation.

141, 142, ¶ 7, 181 P.3d 188, 189 (2008) ("The liability for TPT falls on the taxpayer, not on the taxpayer's customers.") (citing A.R.S. § 42–5024 (2006)).

¶ 13 In this case, the Department assessed the transaction privilege tax pursuant to the retail classification, A.R.S. § 42–5061(A) (2006), which provides in relevant part:

> The retail classification is comprised of the business of selling tangible personal property at retail. The tax base for the retail classification is the gross proceeds of sales or gross income derived from the business. The tax imposed on the retail classification does not apply to the gross proceeds of sales or gross income from:
>
> \*    \*    \*
>
> (15) Food, as provided in and subject to the conditions of article 3 of this chapter and § 42–5074.

This exception for sales of "food" in A.R.S. § 42–5061(A)(15) is significantly limited by "the conditions of article 3 of this chapter" and the definition of "food."

¶ 14 Article 3 includes A.R.S. § 42–5102, which provides several exemptions from transaction privilege taxes:

> A. Except for the gross proceeds of sales or gross income from the sale of food for consumption on the premises, the taxes imposed by this chapter do not apply to the gross proceeds of sales or gross income from sales of food by any of the following:
>
> \*    \*    \*
>
> 2. A retailer who conducts a business whose primary business is not the sale of food but who sells food which is displayed, packaged and sold in a similar manner as an eligible grocery business.
>
> 3. A retailer who sells food and does not provide or make available any facilities for the consumption of food on the premises.
>
> 4. A retailer who conducts a delicatessen business either from a counter which is separate from the place and cash register where taxable sales are made or from a counter which has two cash registers which

are used to record taxable and tax exempt sales or a retailer who conducts a delicatessen business and who uses a cash register which has at least two tax computing keys which are used to record taxable and tax exempt sales.

A.R.S. § 42–5102(A). Food sales by anyone other than a qualified retailer—i.e., the classifications described in § 42–5102(A)—do not qualify for an exemption. Ariz. Admin. Code ("A.A.C.") R15–5–1860(12)(a).

¶ 15 Arizona law presumes that all gross proceeds of sales comprise the tax base for the business until the contrary is established. A.R.S. § 42–5023 (2006). Rigel claims that its sales are exempt because it is a qualified retailer under A.R.S. § 42–5102(A)(2), (3), and (4). We will examine Rigel's arguments for exemption from taxation under each of these three subsections of § 42–5102(A).[5]

### Rigel Does Not Qualify Under A.R.S. § 42–5102(A)(2)

■ ¶ 16 Rigel contends that it qualifies under A.R.S. § 42–5102(A)(2) as a "retailer who conducts a business whose primary business *is not the sale of food* but who sells food which is displayed, packaged and sold in a similar manner as an eligible grocery business." (Emphasis added.) "Food" is defined as "any food item intended for human consumption which is *intended for home consumption* as defined by rules adopted by the department pursuant to § 42–5106." A.R.S. § 42–5101(3) (2006) (emphasis added).

¶ 17 Arizona Administrative Code R15–5–1860(12)(b)(ii) provides further guidance regarding the exemption granted in § 42–5102(A)(2) by defining a "qualified retailer" as:

> Retailers whose primary business is not the sale of food, but who sell food in a manner similar to grocery stores. This category includes stores such as department stores, drug stores, and gas stations.

As the Department has pointed out, examples of such qualified retailers could include Walgreens, Circle K, Target, Walmart, and

---

5. Rigel does not claim to be a qualified retailer, exempt from transaction privilege taxes, under subsections (1), (5), or (6) of § 42–5102(A).

Costco. Each is an entity whose primary business is not the sale of food intended for home consumption but which sells food which is displayed, packaged and sold in a similar manner as an eligible grocery business. *See* A.R.S. § 42–5102(A)(2).

¶ 18 According to Rigel, only about 5 percent of its customers consumed the doughnuts and beverages on the premises. Food sold for consumption on the premises therefore constituted a small percentage of Rigel's overall retail sales, and Rigel does not dispute that the doughnuts sold for consumption off the premises were "food" intended for home consumption. We conclude on this record that Rigel does not satisfy the requirement of § 42–5102(A)(2) exemption as a retailer whose "primary business is not the sale of food."

■ ¶ 19 Rigel contends that its *primary* business was as a restaurant and that it was not primarily selling "food"—meaning food intended for home consumption.[6] We are not persuaded by this challenge to the interpretation of the word "primary" in § 42–5102(A)(2). The tax court understood "primary" in this context to mean more than 50 percent. The statutes do not define "primary" as used here. When the legislature has not defined a word or phrase in a statute, we may consider the definitions of respected dictionaries. *DeVries v. State*, 221 Ariz. 201, 207, ¶ 21, 211 P.3d 1185, 1191 (App.2009); *Urias v. PCS Health Sys., Inc.*, 211 Ariz. 81, 85, ¶ 22, 118 P.3d 29, 33 (App.2005). *See also* A.R.S. § 1–213 (2002) ("Words and phrases shall be construed according to the common and approved use of the language."). "Primary" means "[f]irst or best in degree, quality, or importance." *Webster's II New Riverside University Dictionary* 934 (1994). *See also The New Oxford American Dictionary* 1345 (2d ed. 2005) (defining "primary" as "of chief importance; principal"). We need not, however, determine a precise definition of "primary" in § 42–5102(A)(2) because it is unmistakable on this record that Rigel's primary business is the sale of doughnuts for home consumption. Therefore, we agree

with the tax court that Rigel does not qualify for the transaction privilege tax exemption provided by § 42–5102(A)(2).

¶ 20 Rigel further maintains that it is antithetical to the statute's intent to tax food differently based upon a retailer's business. But § 42–5102 makes clear that the exemption only may be claimed by qualified retailers. This point is driven home by a corresponding regulation that specifies that "[a] retailer other than a qualified retailer must pay a tax measured by the sale of otherwise exempt food even though the sale of such items would be exempt if sold by a qualified retailer." A.A.C. R15–5–1860(12)(a).

¶ 21 Tax distinctions based upon the nature of a retailer's business are not unique to this statute. As the Department points out, the federal government distinguishes between retailers with respect to food stamps. A customer may use food stamps to purchase doughnuts at a grocery store, but may not use them for purchases at a specialty doughnut shop. *See* 7 C.F.R. § 278.1(b)(1)(iv).

¶ 22 Rigel counters that a former Department legislative liaison once wrote that the legislature intended to create a level playing field for all grocery stores and restaurants. But the liaison testified at deposition in this case that the summary of her alleged statement at an internal Uniformity Committee meeting in 2003 was incorrect. She clarified that while taxpayers may have believed that food sold in bulk for home consumption should not be taxable, that was not what the statute said or what the Department's position was.

¶ 23 Rigel also asserts that the Department at one time interpreted the exemption in A.R.S. § 42–5102(A)(2) to include bulk sales by doughnut shops. In 1999, the Department's Food Subcommittee asked the Department to consider interpreting the statutes to include a restaurant as a qualified retailer if the restaurant's primary business was not the sale of food intended for home consumption, but one part of its business was to sell food in bulk the way grocery stores

___

6. Both parties acknowledged at oral argument that some of these definitions and concepts are

"counter-intuitive," at least at first blush.

do. Thus, Marie Callender's could be a qualified retailer because its primary business was the sale of food for consumption on the premises, but it also had a separate counter from which it sold baked goods in bulk for home consumption. The then-director of the Department eventually directed Department section heads to provisionally apply A.R.S. § 42–5102(A)(2) as set forth in a memo that substantially adopted the subcommittee's recommendations. To date, however, the Department has not created a rule or issued a ruling adopting the recommendation that it interpret A.R.S. § 42–5102(A)(2) to include restaurants as qualified retailers; rather, the applicable rule continues to be that restaurants are generally not qualified retailers. A.A.C. R15–5–1862(A). Moreover, the recommendations underscore that the primary business of the taxpayers under discussion was not the sale of food for home consumption. In addition, the Department has long held that Dunkin' Donuts, a retailer similar to Rigel, is not a qualified retailer. *See* Arizona Sales Tax Ruling No. 5–17–80.

¶ 24 Nor are we persuaded by Rigel's reliance upon a Department information letter concluding that Rigel falls within the scope of A.R.S. § 42–5102(A)(2). The letter, from the then-manager of the Tax Research and Analysis Section, does not state that Rigel or other doughnut businesses are qualified retailers. It merely provides that "the exemption for sales of food may extend to retailers whose primary business is not the sale of food for home consumption." Further, the letter cautions that the Department could later determine that its advice was erroneous and the only consequence would be that the Department could abate penalties and interest to the taxpayer receiving the letter.

¶ 25 We cannot attach the same significance to the letter that Rigel does. The letter responded to correspondence from a public accounting company, which stated that "all the items we are inquiring about are purchased from a qualified retailer listed in A.R.S. § 42–5102" and inquired whether items such as prepared salads qualified for exemption. Because the author of the letter was provided minimal information about the taxpayer's operations, and no information

about what was provided with the food and how the food was displayed, the letter hardly qualifies as a binding determination regarding whether Rigel is a qualified retailer.

¶ 26 Finally, there is no evidence that Rigel relied on the letter. With the exception of its separately identified wholesale transactions, Rigel added a charge for the transaction privilege tax to the purchase price it charged customers.

### Rigel Does Not Qualify Under A.R.S. § 42–5102(A)(3)

¶ 27 Alternatively, Rigel contends that its sale of doughnuts from drive-through windows qualifies for exemption from taxation under A.R.S. § 42–5102(A)(3), which provides:

A. Except for the gross proceeds of sales or gross income from the sale of food for consumption on the premises, the taxes imposed by this chapter do not apply to the gross proceeds of sales or gross income from sales of food by any of the following: * * *

3. A retailer who sells food and *does not provide or make available any facilities for the consumption of food on the premises.*

(Emphasis added.) "Facilities for the consumption of food" include tables, chairs, benches, booths, stools, counters, and similar conveniences. A.R.S. § 42–5101(2).

¶ 28 Rigel admits that it provides tables and chairs for customers' use on the premises, but argues that its drive-through window represents a separate business activity with separately defined hours. Section 42–5101(6), A.R.S., defines "premises" as:

the total space and facilities in or on which a retailer conducts his business and which are owned or controlled, in whole or in part, by a retailer or which are made available for the use of customers of the retailer or group of retailers, including any building or part of a building, parking lot or grounds.

¶ 29 Under this definition, Rigel's drive-through window is part of the same space in which tables and chairs are provided. Therefore, notwithstanding that Rigel may

have separately recorded drive-through sales and in-store sales, Rigel fails to qualify under A.R.S. § 42–5102(A)(3) because its premises includes tables and chairs for use by customers to consume doughnuts and beverages.[7]

### Rigel Does Not Qualify Under A.R.S. § 42–5102(A)(4)

¶ 30 Finally, Rigel argues that it is a qualified retailer under A.R.S. § 42–5102(A)(4), which applies to a retailer who conducts a *delicatessen business* (1) from a counter separate from the place and cash register where taxable sales are made, or (2) from a counter which has two cash registers which are used to record taxable and tax exempt sales, or (3) using a cash register with at least two tax computing keys which are used to record taxable and tax exempt sales.

¶ 31 The statute does not define "delicatessen," but the Department's rules state that it is "a business which sells specialty food items, such as prepared cold meats, perishable food and grocery items kept under refrigeration." A.A.C. R15–5–1860(5). Another rule directs a delicatessen to report its sales of taxable food, including hot and cold sandwiches, under the restaurant classification. A.A.C. R15–5–1862(C).

¶ 32 Rigel argues that its stores were delicatessens because they sold "perishable food," but we are not persuaded. Rigel points us to a Department information letter dated March 29, 1999, indicating that a doughnut shop is similar to a delicatessen and could qualify under A.R.S. § 42–5102(A)(4) if it uses a dual cash register method. The main problem with this argument is that the Department's Uniformity Committee opted in November 1999 to *not* extend the delicatessen definition to doughnut and ice cream shops. Specifically, the Committee determined: "The definition of 'delicatessen' should not be broadened to include donut [sic] shops, ice cream shops, etc." Similarly, the aforementioned 1980 tax ruling concluded that doughnut shops are not deli-

catessens. *See* Arizona Sales Tax Ruling # 5–17–80.

¶ 33 Nor can we accept Rigel's contention that specialty food stores, apart from delicatessens, did not exist when Arizona adopted the qualified retailer exemption statutes in 1980. As the Department points out, Winchell's Donuts opened in 1948 and Dunkin' Donuts opened in 1955. Had the legislature wished to exempt specialty doughnut stores as qualified retailers it could have done so in 1980 or anytime since.

¶ 34 Moreover, Rigel fails to satisfy the two cash register and dual key requirements of A.R.S. § 42–5102(A)(4). Rigel admittedly did not have dual keys for taxable and nontaxable items, and it charged taxes on all sales. It consequently did not key in any doughnut sales as non-taxable, and did not distinguish between doughnuts consumed on the premises and those ordered for take-out. Rigel claims sales of a dozen or more doughnuts were rung up separately, but that is not sufficient under A.R.S. § 42–5102(A)(4).

¶ 35 In sum, we agree with the tax court that Rigel does not fall within the definition of a qualified retailer under A.R.S. §§ 42–5102(A)(2), (3), or (4). Therefore, its receipts from doughnut and associated sales do not qualify for tax exemption. *See* A.A.C. R15–5–1860(12)(a).

### THE DELIBERATIVE PROCESS PRIVILEGE

¶ 36 The Department challenges the tax court's rejection of its assertion that the deliberative process privilege protected certain discussions and deliberations within the Department regarding tax policy and tax code interpretations. Before reaching the merits of this issue, however, we must consider Rigel's challenge to the Department's ability to raise this argument on appeal. According to Rigel, this court lacks jurisdiction to consider this argument because the Department did not cross-appeal.

¶ 37 The Department did not need to file a cross-appeal to challenge the tax court's priv-

---

7.  We also reject Rigel's argument that the meaning of "premises" for this purpose should be derived primarily by reference to A.R.S. § 42–

5101(4), which provides examples of "food for consumption on the premises."

ilege ruling. *See* ARCAP 13(b)(3) ("The brief of the appellee may, without need for a cross-appeal, include in the statement of issues presented for review and in the argument any issue properly presented in the superior court."). "Essentially no issues which could lead to the same practical result as that embodied in the judgment will be foreclosed by lack of a cross-appeal." AR-CAP 13 State Bar Committee Note.; *see also Ariz. Health Care Cost Containment Sys. Admin. v. Carondelet Health Sys.*, 188 Ariz. 266, 269, 935 P.2d 844, 847 (App.1996). Our decision with respect to the claimed privilege could not operate to enlarge the Department's relief under this judgment. Accordingly, we have jurisdiction to address the deliberative process privilege argument on the merits.

¶ 38 We recognize that because the Department is the successful party on appeal, the tax court's ruling concerning the deliberative process privilege is not essential to the ultimate result in this case. Nonetheless, we choose in our discretion to address the question for several reasons. First, the Department contends that recognition of a deliberative process privilege is important and necessary to its efficient operation. Second, the Department properly preserved this issue in the tax court, sought special action review of the tax court's ruling, and now presses for a ruling on appeal. Questions of privilege frequently are decided by special action before the conclusion of the underlying case because the wrongful denial of a privilege's protection constitutes an independent harm that cannot be cured by a favorable result on the merits. *See Sun Health Corp. v. Myers*, 205 Ariz. 315, 317, ¶ 2, 70 P.3d 444, 446 (App.2003) ("Because an appeal offers no adequate remedy for the prior disclosure of privileged information, special action jurisdiction is proper to determine a question of privilege."). This court, however, declined to accept jurisdiction when the Department petitioned for special action relief from the tax court's rejection of this privilege in this case. Third, by their very nature, questions of privilege involve the adjudication of rights that exist independently of the merits of the underlying case. A party that is successful on the merits of an action may nonetheless be aggrieved if its privileged communications have been wrongly disclosed by court order. If we decline to review such questions except in those cases where compelled disclosure plainly affects the result in the underlying case, legal errors affecting statutory privilege rights may often, as a practical matter, be capable of repetition while evading review.

### The Tax Court Did Not Err In Rejecting The Department's Deliberative Process Privilege Argument

¶ 39 During discovery in this action, Rigel requested that the Department produce various documents. The Department resisted production of certain documents by asserting the deliberative process privilege. Rigel persuaded the tax court that this privilege did not preclude the Department's production of internal memoranda and correspondence. Whether a privilege exists is a question of law that we review de novo. *Blazek v. Superior Court*, 177 Ariz. 535, 537, 869 P.2d 509, 511 (App.1994).

¶ 40 As a threshold matter, the deliberative process privilege has not heretofore been adopted in Arizona but instead is a federal privilege preserved in "exemption 5" of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(5). *Ariz. Indep. Redist. Comm'n v. Fields*, 206 Ariz. 130, 141, ¶ 33, 75 P.3d 1088, 1099 (App.2003). The statute shields "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The privilege extends to predecisional materials that reflect a government official's deliberative process, including opinions, recommendations, and advice about agency policies. *Fields*, 206 Ariz. at 141, ¶ 33, 75 P.3d at 1099. A litigant may obtain the materials if the need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure. *Federal Trade Comm'n v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1161 (9th Cir.1984). The litigant's ability to overcome the privilege under FOIA is subject to the court's evaluation of various factors, including "(1) the relevance of the evidence[,] (2)

the availability of other evidence[,] (3) the government's role in the litigation[,] and (4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions." *Id.*

¶ 41 Arizona recognizes a legal presumption in favor of disclosing public records. *Cox Ariz. Publ'ns, Inc. v. Collins,* 175 Ariz. 11, 14, 852 P.2d 1194, 1198 (1993). Moreover, we have held that government agencies do not ordinarily have a privilege to refuse to produce evidence unless a statute has specifically created an exemption. *Gordon v. Indus. Comm'n,* 23 Ariz.App. 457, 460, 533 P.2d 1194, 1197 (1975) (citing Udall, Ariz. Law of Evid. § 102 (1960)). To date, our legislature has not codified any such privilege in the Arizona Public Records statutes. *See* A.R.S. §§ 39–121 to –161 (2001 & Supp.2008). We will not, via decisional law, create this privilege at this time. Because this asserted privilege was the sole basis of the Department's refusal to produce specific documents, the tax court did not err in ordering the items to be produced.[8]

## CONCLUSION

¶ 42 We affirm the tax court's grant of summary judgment to the Department and its decision to compel production of the Department's documents.

CONCURRING: PETER B. SWANN, Presiding Judge, and DIANE M. JOHNSEN, Judge.

---

**8.** We agree with Rigel that *Grimm v. Ariz. Bd. of Pardons & Paroles* fails to support the Department's deliberative process privilege argument. 115 Ariz. 260, 564 P.2d 1227 (1977). The Arizona Supreme Court held in *Grimm* that the board could be liable only for grossly negligent or reckless release of a prisoner, and thus "any inquiry into the mental processes of a parole decision is improper." *Id.* at 269, 564 P.2d at 1236. In other words, any such inquiry would not be reasonably calculated to lead to the discovery of admissible evidence. This holding and the court's protective order thus are based on the discovery rules, not on a privilege. *Id.* at 269–70, 564 P.2d at 1236–37.