IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**CITY OF PHOENIX ET AL,**
*Plaintiffs/Appellees/Cross Appellants,*

*v.*

**ORBITZ WORLDWIDE INC. ET AL,**
*Defendants/Appellants/Cross Appellees.*

---

No. CV-18-0275-PR
Filed September 9, 2019

---

Appeal from the Arizona Tax Court
The Honorable Christopher T. Whitten, Judge
Nos. TX2014-000470
TX2014-000471
TX2014-000472
TX2014-000473
TX2014-000474
TX2014-000475
(Consolidated)
**AFFIRMED IN PART; REVERSED IN PART AND REMANDED**

Memorandum Decision of the Court of Appeals,
Division One
Nos. 1 CA-TX 16-0016
1 CA-TX 16-0018
(Consolidated)
Filed Sep. 6, 2018
**VACATED IN PART**

---

COUNSEL:

John Crongeyer (argued), Crongeyer Law Firm P.C., Atlanta, GA; Garrett W. Wotkyns, Schneider Wallace Cottrell Konecky Wotkyns LLP, Scottsdale; and Scott Andersen, Wright Welker & Pauole PLC, Phoenix, Attorneys for City of Phoenix, City of Apache Junction, City of Chandler, City of Flagstaff, City of Glendale, City of Mesa, City of Nogales, City of Prescott, City of Scottsdale, City of Tempe, and City of Tucson

Thomas M. Peterson (argued), Morgan Lewis & Bockius LLP, San Francisco, CA; and Barbara J. Dawson, Andrew M. Jacobs, Snell & Wilmer L.L.P., Phoenix, Attorneys for Orbitz Worldwide Inc, Orbitz LLC, Trip Network Inc, Internetwork Publishing Corp, Expedia Inc, Priceline.com Inc, Travelweb LLC, Travelocity.com LP, Hotels.com LP, and Hotwire

Pat Derdenger, Lewis Roca Rothgerber Christie LLP, Phoenix; and Bennett Evan Cooper, Dickinson Wright PLLC, Phoenix, Attorneys for Amicus Curiae Arizona Tax Research Association

Mark Brnovich, Arizona Attorney General, Rusty D. Crandell, Deputy Solicitor General, Scot G. Teasdale, Assistant Attorney General, Phoenix, Attorneys for Amicus Curiae Arizona Department of Revenue

———————

JUSTICE LOPEZ authored the opinion of the Court, in which JUSTICES BOLICK, GOULD, and BALES (RETIRED) and JUDGE ECKERSTROM[1] joined. VICE CHIEF JUSTICE TIMMER, joined by CHIEF JUSTICE BRUTINEL, concurred in part and dissented in part.

———————

JUSTICE LOPEZ, opinion of the Court:

¶1        We consider whether online travel companies ("OTCs") like Orbitz Worldwide Inc. and the other appellants are subject to municipal privilege taxes under Model City Tax Code ("MCTC" or "the Code")[2] §§ 444 and 447, and if so, whether the City of Phoenix and other city appellees (collectively the "Cities") may assess those taxes, penalties, and interest retroactively. We hold that the OTCs are subject to taxation under

---

[1] Pursuant to article 6, section 3 of the Arizona Constitution, the Honorable Peter J. Eckerstrom, Judge of the Arizona Court Appeals, Division Two, was designated to sit in this matter.

[2] Although each of the Cities has passed its own tax ordinance, those ordinances are based on and do not differ substantively from the MCTC. Because the parties reference the MCTC in their briefs, we do so as well throughout this opinion.

§ 444 because they are "brokers"—as defined by MCTC § 100—engaging in "the business of operating a hotel," and the proceeds from this business— their service fees and markups on room rental rates—constitute taxable gross income. We further hold that the OTCs are not subject to taxation under § 447 because they are not "hotels." Finally, we hold that MCTC § 542(b) bars taxation based on a new policy, procedure, or interpretation of the Code until a city has adopted and provided impacted taxpayers with clear notice of the change, and we remand to the tax court to determine whether § 542(b) bars the Cities from assessing taxes, penalties, and interest due under § 444 before the 2013 Notices of Tax Assessment ("2013 Assessments").

## I.

**¶2**        The OTCs develop, operate, and maintain websites that offer travel-facilitation services. One of those services allows travelers to reserve and pay for hotel rooms. The OTCs do not own the hotels or rooms they advertise; they contract with the hotels to list rooms available for rent.

**¶3**        When a customer requests a hotel reservation, an OTC collects the customer's personal and payment information and provides a total price for the room. The total price is a combination of the "Reservation Rate" or "Nightly Rate" and an amount representing the "Taxes and Fees" or "Tax Recovery Charge and Service Fees." The "Reservation Rate" consists of the room rental rate set by the hotel in its contract with the OTC plus an additional markup that the OTC retains for its services. The "Taxes and Fees" consist of the tax rate the hotel later remits to the city as a privilege tax and an additional service fee paid to the OTC. The OTC does not disclose to the customer the amount of the markup on the room rental rate or the portion of the "Taxes and Fees" remitted for taxes.

**¶4**        Before finalizing a transaction with a customer, the OTC confirms the room rates and availability with the hotel and requests a reservation on the customer's behalf. After the hotel confirms the reservation, the OTC charges the customer's credit card, appearing on the statement as the merchant of record. Until the customer checks into the hotel, the OTC provides customer service support and facilitates any modifications or cancellations.

**¶5** After a customer's stay, the hotel invoices the OTC for the net room rate — not including the OTC's markup — and the amount covering the tax owed by the hotel. The hotel then remits the tax to the city. Neither the OTC nor the hotel pays the city any money representing tax on the OTC's service fees or markups.

**¶6** In 2013, the Cities issued privilege tax assessments against the OTCs — the 2013 Assessments — following a multi-year audit of the OTCs' books and records. The assessments were based on the Cities' position that the OTCs owed unpaid privilege taxes under §§ 444 and 447 for engaging in the business of operating hotels, or alternatively, for acting as brokers for hotels. The OTCs challenged the assessments, and in May 2014 an administrative hearing officer overturned them, concluding the OTCs were not subject to taxation under §§ 444 or 447 because the OTCs were neither hotel operators nor brokers.

**¶7** In the ensuing appeal, the tax court partially granted and partially denied the Cities' motion for summary judgment. The court concluded the OTCs do not own or operate hotels, but the OTCs "clearly and unambiguously" qualify as "brokers" under the Code and are subject to taxation under both §§ 444 and 447. The court also concluded that the Cities' position on OTCs as "brokers" in the 2013 Assessments constituted "a new interpretation or application" under § 542(b), thus the Cities could only assess taxes prospectively.

**¶8** The OTCs appealed the tax court's ruling regarding their liability for taxes, and the Cities cross-appealed the ruling barring retroactive collection of the tax. The court of appeals held that the OTCs are subject to taxation under § 444 because they qualify as "brokers" engaging in the taxable activity under the provision, and the OTCs' proceeds from that activity — service fees and markups — are part of the taxable gross income. *City of Phoenix v. Orbitz Worldwide Inc.*, Nos. 1 CA-TX 16-0016; 1 CA-TX 16-0018, 2018 WL 4265950, at *3 ¶ 14 (Ariz. App. Sept. 6, 2018) (mem. decision). It further held that the OTCs are not subject to taxation under § 447 because the tax liability of that provision is limited to hotels. *Id.* at *5 ¶ 27. Finally, the court held that the Cities could assess the taxes, penalties, and interest under § 444 retroactively, for years preceding the 2013 Assessments, "[b]ecause there was no change in the Cities' application or interpretation of the Code and the OTCs' business activities are not new." *Id.* at *6 ¶ 32.

4

**¶9** We granted review because the applicability of municipal privilege taxes to the OTCs is a recurring legal issue of statewide importance. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution.

## II.

**¶10** "City . . . ordinances are to be construed by the same rules and principles which govern the construction of statutes," *Rollo v. City of Tempe*, 120 Ariz. 473, 474 (1978), and "we review issues of statutory interpretation de novo, seeking to effectuate the drafters' intent." *City of Surprise v. Ariz. Corp. Comm'n*, 246 Ariz. 206, 210 ¶ 10 (2019). "In construing a specific provision, we look to the statute as a whole and we may also consider statutes that are *in pari materia*—of the same subject or general purpose— for guidance and to give effect to all of the provisions involved." *Stambaugh v. Killian*, 242 Ariz. 508, 509 ¶ 7 (2017). If possible, we give meaning "to every word and provision so that no word or provision is rendered superfluous." *Nicaise v. Sundaram*, 245 Ariz. 566, 568 ¶ 11 (2019). If the language of a statute is unambiguous, "we apply it without further analysis." *Glazer v. State*, 237 Ariz. 160, 163 ¶ 12 (2015).

## III.

**¶11** We first address whether the OTCs are subject to taxation under § 444. This provision imposes a tax on "the gross income from the business activity upon every person engaging in or continuing in the business of operating a hotel charging for lodging." Therefore, to be subject to taxation under § 444, the OTCs' business activities must constitute "the business of operating a hotel," the proceeds the OTCs receive from hotel customers in the form of markups and service fees must be part of the taxable gross income contemplated by § 444, and the OTCs must qualify as "persons" liable for the tax. We agree with the court of appeals that all three requirements are satisfied here. *See Orbitz*, 2018 WL 4265950, at *3 ¶ 14.

**¶12** At the outset, we recognize that other jurisdictions have reached varying conclusions on whether OTCs are subject to taxes on hotel lodging. *Compare, e.g.*, *City & County of Denver v. Expedia, Inc.*, 405 P.3d 1128, 1138 ¶ 36 (Colo. 2017) (city ordinance taxed privilege of purchasing lodging and OTCs' markups are inseparable from selling price of lodging), *and*

*Travelocity.com, L.P. v. Wyo. Dep't of Revenue*, 329 P.3d 131, 143 ¶ 41, 145 ¶ 55 (Wyo. 2014) (OTCs qualify as "vendors," taxable under city's ordinance, and their markups are part of the "sales price" subject to city's tax on hotel lodging), *with State v. Priceline.com, Inc.*, 206 A.3d 333, 341 (N.H. 2019) (statute at issue explicitly limited lodging tax to "operators," and OTCs did not qualify as hotel operators), *and Pitt County v. Hotels.com, G.P., LLC*, 553 F.3d 308, 313 (4th Cir. 2009) (same). Each of these cases was decided based on the language of the particular statute or ordinance at issue. Because the language of § 444 and the rest of the Code differs in several key respects—especially with respect to its treatment of "brokers"—we do not find these cases particularly instructive in resolving the issues before us. Instead, our analysis is guided by the language of the Code.

**A.**

**¶13**        We agree with the court of appeals that the OTCs are engaged in the taxable business activity: "the business of operating a hotel." *Orbitz*, 2018 WL 4265950, at *4 ¶ 21. As a threshold matter, we note that § 444 is a transaction privilege tax because it levies "an excise tax on the privilege or right to engage in an occupation or business . . . . [It] is not a sales tax, but rather is a tax on the gross receipts of a person or entity engaged in business activities." *See Ariz. Dep't of Revenue v. Action Marine, Inc.*, 218 Ariz. 141, 142 ¶ 6 (2008) (internal quotations and citations omitted); *see also* MCTC § 400 (broadly imposing privilege taxes); *Rigel Corp. v. State*, 225 Ariz. 65, 67 ¶ 12 (App. 2010) (noting that transaction privilege taxes, as compared to sales taxes, are levied on gross receipts rather than individual sales and on business providers rather than consumers).

**¶14**        The taxable business activity under § 444 is "the business of operating a hotel." Section 100 defines "business" to mean, in relevant part, "all activities or acts, personal or corporate, engaged in or caused to be engaged in with the object of gain, benefit, or advantage, either directly or indirectly." This section also defines "hotel" as brick-and-mortar lodging places.[3] But the Code does not define what it means to "operate" such

---

[3] Under § 100, "'*Hotel*' means any public or private hotel, inn, hostelry, tourist home, house, motel, rooming house, apartment house, trailer, or other lodging place within the City offering lodging, wherein the owner thereof, for compensation, furnishes lodging to any transient, except foster

locations. Because it does not appear from the context that the drafters intended a special meaning, we are guided by the word's ordinary meaning. *See State Tax Comm'n v. Peck*, 106 Ariz. 394, 395 (1970); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 69 (2012) ("Words are to be understood in their ordinary everyday meanings – unless the context indicates that they bear a technical sense.").

**¶15**    The OTCs and the dissent assert that the "business of operating a hotel" must be limited to the business activity of hotel owners and operators—those who physically own or furnish lodging to customers. *See infra* ¶ 49 (citing *Pitt County*, 553 F.3d at 313 and *Mont. Dep't of Revenue v. Priceline.com, Inc.*, 354 P.3d 631, 635 (Mont. 2015)). We disagree. As we noted previously, *supra* ¶ 12, the cases upon which the dissent relies are inapposite because their holdings were decided based on the language of the particular statute or ordinance at issue. In *Pitt County*, the tax provision at issue levied a tax on "[o]perators of hotels, motels, tourist homes, tourist camps, and similar type businesses." 553 F.3d at 311. Similarly, the Montana tax provision levied a tax on an "owner or operator" of lodging facilities. *Mont. Dep't of Revenue*, 354 P.3d at 634 ¶ 8. Here, § 444 levies a much broader tax on "*every person* engag[ed] . . . in the business of operating a hotel." (Emphasis added.)

**¶16**    In construing § 444, we look to the Code as a whole and attempt to give meaning "to every word and provision so that no word or provision is rendered superfluous." *See Nicaise*, 245 Ariz. at 568 ¶ 11; *Stambaugh*, 242 Ariz. at 509 ¶ 7; Scalia & Garner, *supra* ¶ 14, at 167, 174 (discussing the "Whole-Text" and "Surplusage" canons). And while the drafters used specific language to limit the additional tax liability of § 447 to the gross income of "hotels,"[4] they chose not to do the same for § 444. This difference suggests that the tax liability of § 444 extends beyond the hotels' owners and operators. Indeed, § 444 expressly imposes the tax on the *entire* business activity and on *every* "person" engaged in that activity. *See infra* ¶¶ 29–30 (discussing the Code's treatment of the defined term "person" and how it applies to the OTCs).

---

homes, rest homes, sheltered care homes, nursing homes, or primary health care facilities."

[4] Section 447 levies a tax on "the gross income from the business activity of any hotel engaging or continuing within the City in the business of charging for lodging."

¶17        The dissent further suggests that § 447 and § 444 impose taxes on the same taxpayer (i.e., hotel operators). *Infra* ¶ 52. We disagree. Although § 447 does not identify a specific taxpayer, it identifies the taxable gross income as "the gross income from the business activity of any hotel." This taxable gross income is distinctly different than that identified in § 444: the gross income from the *entire* business activity and on *every* person engaged in that activity. Because the taxable gross income differs between the two provisions, the impacted taxpayer may differ as well. The fact that the tax under § 447 is "[i]n addition to" the tax under § 444 simply means that *some* of the taxpayers liable for the § 444 tax (i.e., hotel owners and operators) will also be liable for the § 447 tax. While the dissent ignores the drafters' choice to use different language to distinguish the tax liabilities of §§ 444 and 447, we interpret this difference to mean that § 444 applies more broadly—with respect to both taxable gross income and taxpayers—than § 447.

¶18        Thus, we reject the OTCs' and dissent's assertion and consider the more expansive meaning of "operating a hotel." As a transitive verb, "operate" means "to put or keep in operation." *Operate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/operate (last visited September 4 , 2019). And "operation" means "the quality or state of being functional or operative." *Operation*, Merriam-Webster, https://www.merriam-webster.com/dictionary/operation (last visited September 4, 2019). Considering these ordinary meanings and the definitions provided by the Code, we conclude that § 444 imposes a tax liability on *any* "person"—not just a hotel owner or operator—that engages for profit in business activities that are central to keeping brick-and-mortar lodging places functional or in operation. Because the function of hotels—as defined by the Code—is to furnish lodging to transients, the taxable business activities are those that are essential to furnishing lodging. *See* § 100 (definition of "hotel").

¶19        Undeniably, the OTCs engage in those types of business activities. From the time a customer makes a credit card payment until the customer physically checks into the hotel, the OTCs facilitate all aspects of the transaction and receive compensation in the form of service fees and markups on the room rental rates for providing their services. It would be illogical to conclude that the OTCs—which advertise available rooms, solicit potential customers, collect customers' information, process

payments, confirm reservations, provide customer service, and facilitate reservation modifications and cancellations—are not actively engaged in "the business of operating a hotel." Indeed, all these services provided by the OTCs are central to keeping a hotel functional and in operation.

¶20 We similarly reject the OTCs' related argument that they are not engaged in the taxable business activity of "operating a hotel" because they perform only a limited number of hotel operations before customers check into the hotels. Nothing in the Code suggests that the taxable gross income of § 444 is limited to the income of persons who perform *all* the functions of a hotel. On the contrary, the fact that the drafters of § 444 imposed the tax on the gross income of the broadly defined "person" (which includes "brokers," *infra* ¶ 29) rather than the more narrowly defined "hotel" necessarily implies that the drafters intended to tax the gross income of all persons engaged in hotel operations and not just the gross income of those who perform all the functions of a hotel. *See City of Flagstaff v. Mangum*, 164 Ariz. 395, 398 (1990) ("Where the legislature uses a term within one statute and excludes it from another, the term usually will not be read into the provision from which it was excluded.").

¶21 The dissent contends that our holding here "necessarily imposes [§ 444 tax liability] on [other] persons and entities . . . who offer hotel booking services for a profit," such as "airlines, credit card companies, [and] brick-and-mortar travel agents." *Infra* ¶ 54. We agree. As adduced in the record and during oral argument, hotels already remit taxes based on the full amount charged to hotel customers, with no deductions for markups or service fees, when brick-and-mortar travel agents and credit card companies (e.g., American Express Travel) facilitate hotel lodging but customers pay the entire transaction amount to the hotel. That brick-and-mortar travel agents and credit card companies' service fees, like the OTCs', may be taxable if customers pay such entities directly rather than hotels is not an unintended consequence. But the dissent takes this one step further, suggesting that our holding would also impose tax liability on "third-party entities who provide maintenance, housekeeping, [and] gardening." *Infra* ¶ 55. On this point, such secondary services are plainly distinguishable from those performed by the OTCs and are not necessarily central to the primary function of a hotel to furnish lodging. Nor, unlike the OTCs, are those service providers "brokers." *See infra* ¶¶ 29–30. But we need not decide this issue here because the applicability of § 444 to such entities has not been briefed and is not before us.

**¶22** The OTCs argue generally that we must reject the court of appeals' and Cities' interpretations here and of other portions of the Code discussed below because the language is not clear and unambiguous, and any ambiguity must be resolved in the OTCs' favor. The dissent echoes this argument for our holding regarding § 444. *Infra* ¶ 56. It is a well-settled rule in Arizona that ambiguities in "revenue statute[s] should be construed liberally in favor of the taxpayer and strictly against the state." *See Ebasco Servs. Inc. v. Ariz. State Tax Comm'n*, 105 Ariz. 94, 97 (1969). But this rule only applies if, after exhausting all other tools of statutory construction, a court concludes that a statute remains ambiguous. *See BSI Holdings, LLC v. Ariz. Dep't of Transp.*, 244 Ariz. 17, 22 ¶ 25 (2018). The rule does not apply here because, after employing relevant tools of statutory construction, we do not find the language of § 444 or its accompanying definitions ambiguous.

**B.**

**¶23** We also agree with the court of appeals that the markups and service fees the OTCs collect from hotel customers are part of the gross income taxable under § 444. *See Orbitz*, 2018 WL 4265950, at *4 ¶¶ 22–24. The OTCs would have us limit the taxable gross income under § 444 to the gross income of hotels, but such an interpretation conflicts with the express language of the provision and its accompanying definitions. Section 200 broadly defines "gross income" to include all proceeds from a taxable activity,[5] and § 444 imposes a tax on the gross income of every "person" engaged in the business of operating hotels. As established above, the OTCs are engaged in the business of operating hotels. *See supra* ¶¶ 13–19.

---

[5] Gross income, under § 200(a), includes:

    (1) the value proceeding or accruing from the sale of property, the providing of service, or both.

    (2) the total amount of the sale, lease, license for use, or rental price at the time of such sale, rental, lease, or license.

    (3) all receipts, cash, credits, barter, exchange, reduction of or forgiveness of indebtedness, and property of every kind or nature derived from a sale, lease, license for use, rental, or other taxable activity.

    (4) all other receipts, whether payment is advanced prior to, contemporaneous with, or deferred in whole or in part subsequent to the activity or transaction.

And in the conduct of that business, the OTCs charge hotel customers service fees and markups on the hotel room rental rates. Thus, the OTCs' service fees and markups constitute proceeds from the taxable activity and are part of the taxable gross income contemplated by § 444. *See* § 400(c) (establishing a presumption "that all gross income . . . is subject to the tax until the contrary is established by the taxpayer").

¶24 The OTCs argue their service fees and markups are exempt from § 444 taxation because the income they receive from customers is for "travel-facilitation, non-lodging services," such as comparison shopping and loyalty programs, which differ from the services offered by hotels. We are unpersuaded. Although the OTCs may provide some services that the hotels do not, the OTCs also provide hotel customers with numerous services that are central to operating hotels and, like the hotels, are subject to § 444 taxation on the gross income from the provision of those services.

¶25 Clearly, if a hotel were to fractionalize all the aspects of operating the hotel, charging separately for reservation services, advertising, and customer support, the hotel would still be subject to § 444 taxation on the income from those services. *See* § 444 (taxing the gross income generated by "operating a hotel charging for *lodging*") (emphasis added); § 100 (defining "lodging" to include "services and accommodations accompanying the use and possession of [a] dwelling space"). Therefore, the OTCs—which do not distinguish in their markups and service fees their hotel-related services from other services they may provide—cannot eliminate their service fees and markups from the taxable gross income based on the other services they provide.

¶26 Indeed, failure to include the OTCs' service fees and markups in the taxable gross income results in illogical and unjustifiable tax consequences. The OTCs conceded at oral argument that if a customer reserves a room on an OTC site but chooses to pay the full amount charged by an OTC directly to the hotel, the hotel remits taxes on the entire amount. But if the customer opts to pay the OTC, the hotel remits taxes on a lesser amount. For example, assume an OTC contracts with a hotel for a discounted net rental rate of $100 in a city with a combined 10% occupancy tax. The OTC then advertises the room for $150, plus an additional $15 for taxes and service fees. If a customer pays the hotel $165, the hotel keeps $100, remits $16.50 to the city, and pays the OTC the remaining $48.50. If a customer pays the OTC instead, the hotel invoices the OTC after the

customer's stay for $110, keeping $100 and remitting $10 to the city. The OTC keeps the remaining $55. Thus, in this example, the customer's choice between paying the hotel and paying the OTC would result in a difference of $6.50 in the amount of taxes paid to the city—an approximately 40% reduction in tax revenue to the city if the customer pays the OTC. Although this disparity could be justified if § 444 explicitly imposed a tax solely on the gross income of hotels, it cannot be justified when the statute imposes the tax on the entire business activity and on every "person" engaged in that activity. *See supra* ¶ 16.

¶27 The dissent categorizes this disparity as "a matter of policy that should be left to the MCTC drafters, not this Court." *Infra* ¶ 57. But the dissent's argument is premised on its assumption that the gross income taxed by § 444 does not cover the total amount paid by hotel guests. *Id.* Because we conclude that the tax liability of § 444 *does* apply to the total amount by applying to the entire taxable business activity and on every person engaged in that activity, *supra* ¶¶ 16, 23, we reject the dissent's assertion that this disparity is merely a "loophole." *See infra* ¶ 57 (citing *Pitt County*, 553 F.3d at 314 and *Louisville/Jefferson Cty. Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 388–89 (6th Cir. 2009)).

¶28 The OTCs also argue that their service fees are excluded from taxation under § 444(b)(5), which excludes "[g]ross proceeds of sales or gross income from commissions received from a person providing services or property to the customers of the hotel." But even if we accept that the OTCs' service fees constitute a commission, the MCTC Regulations expressly provide that "brokers shall be wherever necessary treated as taxpayers for all purposes" and "[n]o deduction shall be allowed for any commissions or fees retained by . . . broker[s]," absent limited exceptions inapplicable here. MCTC Reg. 100.1(a); *see infra* ¶¶ 29–31 (concluding that OTCs qualify as "brokers" under the Code). More importantly, the OTCs receive their service fees from hotel customers, not persons "providing services or property" to those customers.

## C.

¶29 We further agree with the court of appeals that the OTCs qualify as "persons" subject to the tax liability of § 444 because they are "brokers." *See Orbitz*, 2018 WL 4265950, at *3 ¶¶ 15–20. Section 444 imposes a tax on the gross income of all "persons" engaged in the taxable business

activity. In turn, § 100 defines "person" to include numerous entities, including a "broker," and defines "broker" as "any person engaged or continuing in business who acts for another for a consideration in the conduct of a business activity taxable under this Chapter, and who receives for his principal all or part of the gross income from the taxable activity." Thus, to qualify as "brokers" under the Code's definition, the OTCs must be (1) acting for the hotels for a consideration, (2) conducting "the business of operating a hotel," and (3) receiving for the hotel all or part of the gross income of that business.

¶30        As discussed above, the OTCs are engaged in "the business of operating a hotel," *supra* ¶¶ 13–19, and the income they receive in the form of service fees and markups is part of the taxable gross income under § 444, *supra* ¶¶ 20–24. The OTCs also regularly collect from hotel customers the entire costs of the lodging, remitting only portions of it to the hotels. As to the last point, the OTCs argue that to the extent they may act as "brokers," they do so only for travelers, not hotels. We disagree. The OTCs may provide broker-like services for hotel customers, but they also act for the hotels by providing services central to operating the hotels, including advertising, booking, and customer support. Although MCTC Regulation 100.1(b) refers to a property manager as an example of a "broker," it is only an example and not an exhaustive list; in fact, it is offered to illustrate only the unrelated proposition that a broker property manager may have to pay the privilege tax even if the principal has no tax liability.

¶31        In sum, the OTCs fulfill all the requirements to satisfy the statutory definition of "brokers," their service fees and markups are part of the gross income contemplated by § 444, and the services they provide to hotel customers qualify as "the business of operating a hotel." Additionally, the Code's Regulations recognize that the taxable gross income under § 444 includes the income of "brokers" engaged in the taxable business activity. *See* MCTC Reg. 100.1(a) ("[B]rokers shall be wherever necessary treated as taxpayers for all purposes . . . . No deduction shall be allowed for any commissions or fees retained by . . . broker[s] . . . ."). For these reasons, we hold that the OTCs' service fees and markups on hotel room rental rates are subject to taxation under § 444.

**IV.**

¶32        We next address whether the OTCs are subject to taxation under § 447.  Unlike § 444, which imposes a tax on the gross income of "every person engag[ed] . . .  in the business of operating a hotel," § 447 imposes an additional tax only on the gross income of "hotel[s]." Specifically, this provision levies a tax on "the gross income from the business activity of any hotel engaging or continuing within the City in the business of charging for lodging."  § 447.  The court of appeals held "that the language of [§ 447] limits taxpayers to hotels renting lodging to customers.  It does not extend to brokers engaging in hotel operations, as reflected in other sections of the Code."  *Orbitz*, 2018 WL 4265950, at *5 ¶ 27. We agree.  The Code's definition of "hotel" is expressly limited to brick-and-mortar lodging places; it does not include a "broker" for a hotel or any other entity remotely affiliated with an OTC.  *See* MCTC § 100 (definition of "hotel").  Thus, the gross income of the hotels—the taxable gross income under § 447—does not include the OTCs' income (i.e., markups and service fees).

¶33        The Cities argue § 447—like § 444—applies to the gross income of the entire lodging transaction, including any income earned by "brokers," because § 447 must be read in conjunction with MCTC § 400, which establishes the legal presumption that the privilege taxes are upon all "gross income of *persons*."  (Emphasis added.)  The Cities also cite to the Code's definition of "gross income," which broadly encompasses all value derived from the taxable activity.  *See* MCTC § 200(a).  We disagree that § 447 can be interpreted so expansively.  Section 400 imposes privilege taxes only "upon persons on account of their business activities, *to the extent provided elsewhere in this [a]rticle*."  (Emphasis added.)  And despite the Code's broad definition of "gross income," § 447 "limits the taxable income to business activities of *hotels*."  *See Orbitz*, 2018 WL 4265950, at *5 ¶ 27.

¶34        The Cities further argue that § 447 must be interpreted to apply to "brokers" because limiting tax liability under the provision to hotels will allow hotels to evade those taxes by setting up online shell companies to broker their hotel room transactions.  The Cities cite to the MCTC Regulations, which state that "to prevent evasion of taxes imposed . . . brokers shall be wherever necessary treated as taxpayers for all purposes."  *See* MCTC Reg. 100.1(a).  We disagree that our holding will inspire—much less allow—such activity.  The Code explicitly contemplates

and preempts any measures taken to evade taxes: Sections 210 and 220 expressly authorize tax collectors to examine transactions between affiliated companies or persons, as well as transactions potentially made to evade taxes, to determine the appropriate gross income subject to tax. And in the event a hotel is using a broker to evade tax liability under § 447, the city could invoke MCTC Reg. 100.1(a) to collect from the broker. Further, as noted previously, *supra* ¶¶ 29–31, "brokers" are taxpayers for purposes of assessing tax liability under § 444. Thus, for purposes of interpreting § 447, it is not necessary to apply the provision beyond its terms to prevent tax evasion.

## V.

**¶35** Having established that the OTCs are subject to taxation under § 444, we next consider the Cities' authority to assess the taxes, penalties, and interest under § 444 against the OTCs retroactively, before the 2013 Assessments. MCTC § 542(b) provides that if a city "adopts a new interpretation or application of any [MCTC] provision . . . or determines that any provision applies to a new or additional category or type of business and the change in interpretation or application is not due to a change in the law," then the city "shall not assess any tax, penalty or interest retroactively based on the change in interpretation or application."[6] The tax court concluded that the Cities are barred from retroactive assessments before 2013 because the Cities never attempted to apply or enforce the taxes prior to that year. The court of appeals reversed the tax court and held that the Cities were permitted to collect taxes for the years preceding the 2013 Assessments "[b]ecause there was no change in the Cities' application or interpretation of the Code and the OTCs' business activities are not new." *Orbitz*, 2018 WL 4265950, at *6 ¶ 32.

**¶36** As an initial matter, we note that the language of § 542(b) is framed in the disjunctive, barring retroactive assessment of taxes, penalties, and interest when a city "adopts a new interpretation *or application*" apart from a change in the law. (Emphasis added.) Thus, either a new interpretation or a new application of § 444 suffices to bar the Cities from assessing the taxes, penalties, and interest of § 444 retroactively. *See Devenir Assocs. v. City of Phoenix*, 169 Ariz. 500, 503 (1991) ("The court must, if possible, give meaning to each clause and word in the statute or rule to

---

[6] Section 542(b) mirrors its state tax code counterpart, A.R.S. § 42-2078.

avoid rendering anything superfluous, void, contradictory, or insignificant."). The Code does not explicitly define either "interpretation" or "application," but it does state that these terms "include[] policies and procedures which differ from established interpretations of this Chapter." *See* § 542(c); *cf.* A.R.S. § 42-2078(D) (stating that "'new interpretation or application' includes policies and procedures adopted by administrative rule, tax ruling, tax procedure or instructions to a tax return"). And "application" is commonly defined as "an act of putting something to use." *Application*, Merriam-Webster, https://www.merriam-webster.com/dictionary/application (last visited September 4, 2019). Based on this language and definition, we find that § 542(b) expressly protects taxpayers from retroactive taxation when a city puts into use any new policy, procedure, or interpretation of the Code that differs from a previous formal interpretation of the Code and is unattributable to any change in the law.

¶37 Section 542(b)'s express bar on retroactive taxation based on any changes in interpretation or application embodies the principle of fair notice to taxpayers. In interpreting tax statutes, we have held that such "statutes should provide clear notice of obligations so that taxpayers may comply and order their affairs accordingly." *BSI Holdings*, 244 Ariz. at 22 ¶ 25. And although privilege taxes are self-assessed, *see Tucson Mech. Contracting, Inc. v. Ariz. Dep't of Revenue*, 175 Ariz. 176, 178 (App. 1992) (noting that the "liability for transaction privilege taxes arises automatically when a taxpayer engages in taxable business activity in Arizona"), they are not self-interpreted. In light of § 542's bar on retroactive taxation based on a new interpretation or application not due to a change in the law, we see no reason not to require the same "clear notice" from a city to overcome that bar. Thus, when a city seeks to collect taxes on activities or a class of taxpayers based on a new interpretation or application of the Code, it cannot do so for periods before it provides notice —whether by public statements or communications to particular taxpayers —to those affected. Thus, we must decide whether the Cities adopted a new interpretation or application of the Code and, if so, whether the Cities notified the OTCs of the change.

¶38 Here, the OTCs have facilitated reservations at hotels in the Cities for over a decade, and the Cities never attempted to impose the tax before the 2013 Assessments. But the "continued failure to collect a tax does not preclude eventual taxation." *Ariz. Lotus Corp. v. City of Phoenix*, 136 Ariz. 22, 24 (App. 1983) (allowing enforcement of an unambiguous tax

statute despite earlier contrary administrative interpretations (citing *Miami Copper Co. v. State Tax Comm'n*, 121 Ariz. 150, 153 (App. 1978))). Thus, mere delinquent enforcement does not implicate § 542's bar on retroactive taxation.

**¶39** The OTCs argue that there is record evidence that at least some Cities, through City-issued online guidance, affirmatively indicated, at least by implication, that the OTCs were *not* taxpayers under § 444 as "brokers" before the 2013 Assessments because hotel industry privilege taxes were limited to entities that were physically located in a city and operated hotels. *See, e.g.*, Hotel/Motel, Scottsdale Privilege & Use Tax (July 2013), available at https://web.archive.org/web/20140520230355/ http:/www.scottsdaleaz.gov/Assets/Public+Website/taxes/HotelMotel. pdf ("You must be licensed and pay tax if you are located in Scottsdale and you operate a hotel/motel charging for lodging space furnished to any person."). The OTCs contend this proves that the 2013 Assessments embodied a new interpretation or application of the Code concerning the OTCs' status as "brokers" under § 444 because it differs from previous City-issued online guidance.

**¶40** The Cities argue they have interpreted and applied the "brokers" policy since 2002. The Cities rely on a Private Taxpayer Ruling[7] from 2002 in which a City of Scottsdale Tax Audit Manager, in response to an inquiry from an OTC, interpreted the Code in a manner consistent with our current interpretation of § 444, identifying the OTCs as "brokers" and the income they receive from markups as part of the taxable gross income. The Cities also rely on a 2007 letter from the City of Peoria to an OTC industry representative, relaying substantially the same information as the 2002 ruling. Finally, the Cities note that the 2013 Assessments stemmed from a multi-jurisdictional audit, which two of the OTCs reported in their 2008 Security Exchange Commission filings as ongoing administrative procedures that could result in assertions of claims against the OTCs for unpaid hotel occupancy taxes.

**¶41** Unquestionably, if a city issues a private taxpayer ruling, in which a city official interprets and applies the Code for a taxpayer and

---

[7] A Private Taxpayer Ruling is a public written statement of a city's position interpreting the Code and applying the Code to a specific set of facts or a particular tax situation. MCTC § 597(k); *cf.* A.R.S. § 42-2101.M.1.

provides the subject-taxpayer with clear notice, § 542(b) will not bar a city from assessing taxes, penalties, and interest against that taxpayer from the date it issued the ruling. But one city's ruling for one taxpayer does not provide clear notice to all OTCs on behalf of all the Cities. Similarly, one city's letter to an OTC industry representative is insufficient—even for the city sending the letter—to show that the impacted taxpayers (i.e., the OTCs) were formally notified. And the OTCs' securities filings are evidence of no more than an awareness that the Cities' audits *might* result in assertions of claims. It is possible that, as part of the Cities' 2008 multi-jurisdictional audit, the Cities provided the OTCs represented in this case with official notices of their intent to assess taxes against the OTCs based on their status as "brokers," but such evidence is not in the record currently before us.

**¶42** In sum, there is evidence in the record that the Cities' OTC "broker" position in the 2013 Assessments arguably represents a change from some of the Cities' earlier online tax guidance on the issue. *Supra* ¶ 39. There is also countervailing evidence that some of the Cities may have notified some of the OTCs before the 2013 Assessments that the OTCs were taxable as "brokers." *Supra* ¶ 40. We conclude that a remand is necessary to resolve these factual disputes as to individual cities and taxpayers.

**¶43** The Cities and the OTCs dispute the allocation of the burden of proof under § 542(b). The Code is silent on this issue. Notably, § 542(b)'s state law counterpart, § 42-2078, imposes the burden of proving whether an "interpretation or application" of a tax provision is "new" on the taxpayer as an affirmative defense. § 42-2078(b)(3) ("The change [in interpretation or application] is an affirmative defense in any administrative or judicial action for retroactive assessment of tax, interest and penalties to taxable periods before the new interpretation or application was adopted."). This approach accords with the long-standing approach to place the burden of proof on the taxpayer if the taxing statute fails to address the issue. *See, e.g.*, *State Tax Comm'n v. Magma Copper Co.*, 41 Ariz. 97, 104 (1932). We see no reason to treat the Code and state tax code differently in this respect.

**¶44** On remand, if the OTCs prove that the Cities' 2013 Assessments constitute a new interpretation or application of the Code rather than mere delayed enforcement, the Cities will bear the burden of proving to the tax court that they nevertheless provided the OTCs with clear notice of an intent to tax the OTCs under § 444 based on their status as "brokers." *See, e.g.*, *Harvest v. Craig*, 195 Ariz. 521, 524 ¶ 14 (App. 1999)

(stating that, when a statute is silent on the issue, "the allocation of a burden of proof depends, *inter alia*, on what is fair, what is convenient, who is seeking to change the status quo, and policy considerations such as those disfavoring certain defenses") (citing McCormick on Evidence § 337, at 432 (4th ed. 1992)); *cf. BSI Holdings*, 244 Ariz. at 22 ¶ 25 (noting that "statutes should provide clear notice of obligations so that taxpayers may comply and order their affairs accordingly").

¶45 Accordingly, we hold that § 542(b) bars retroactive taxation based on a new policy, procedure, or interpretation of the Code until such time that a city has adopted any such change *and* provided the impacted taxpayers with clear notice of the change.

## VI.

¶46 For the foregoing reasons, we vacate paragraphs 29 through 32 of the court of appeals' decision, as well as the portion of paragraph 33 reversing the tax court's conclusion "that the Cities may not assess tax, penalties, and interest before 2013," and we remand to the tax court to determine, consistent with this Opinion, whether MCTC § 542(b) bars the Cities from assessing taxes, penalties, and interest due under § 444 before the 2013 Assessments.

TIMMER, V.C.J., joined by BRUTINEL, C.J., dissenting.

¶47        Section 444 of the Model City Tax Code ("MCTC") imposes transaction privilege taxes on "every person engaging or continuing in the business of operating a hotel charging for lodging and/or lodging space." Whether online travel companies ("OTCs") are "brokers," and therefore "persons" under the MCTC, or not, the dispositive issue is whether they engage in the business of operating hotels.  The majority misinterprets § 444 as applying to anyone "engage[d] for profit in business activities that are central to keeping brick-and-mortar lodging places functional or in operation," including OTCs.  *See supra* ¶¶ 18–19.  In my view, § 444 has a narrower meaning that excludes OTCs.  And because no other provision of the MCTC applies, the OTCs are not subject to transaction privilege taxes. I respectfully dissent.

¶48        The applicability of § 444 to OTCs depends on the meaning of "operating" in that provision.  Because the MCTC does not define the term, we use its ordinary meaning.  *See Arizona ex rel. Brnovich v. Maricopa Cty. Cmty. College Dist. Bd.*, 243 Ariz. 539, 541 ¶ 7 (2018).  "Operate" as a transitive verb means "to put or keep in operation" as in "operated a grocery store."  *Operate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/operate (last visited July 31, 2019).  "Operation" means "the quality or state of being functional or operative."  *Operation*, Merriam-Webster,        https://www.merriam-webster.com/dictionary/ operation (last visited July 31, 2019).  Thus, a person engages in the business of operating a hotel, and is taxed for the privilege of doing so under § 444, by putting a hotel into a functional or operative state or keeping it in operation.

¶49        Applying § 444's ordinary meaning here, OTCs do not engage in the business of operating hotels.  OTCs neither "put" hotels into a "functional or operative" state nor "keep" them in that state.  OTCs do not own hotels, oversee hotel operations, or let hotel rooms.  *See Pitt County v. Hotels.com, L.P.*, 553 F.3d 308, 313 (4th Cir. 2009) (applying the dictionary definition of "operator" and "operate" and concluding that OTCs "have no role in the day-to-day operation or management of the hotels" and are therefore not "operators"); *Mont. Dep't of Revenue v. Priceline.com, Inc.*, 354 P.3d 631, 635 (Mont. 2015) ("The OTCs do not fit within the dictionary definition of 'owners or operators.'  They do not possess, run, control,

manage, or direct the functioning of a hotel or rental agency.").[8]   And hotels, which take reservations outside the OTC-process, do not depend on OTCs to operate their businesses.  OTCs indisputably facilitate transactions between hotels and travelers by conveying reservation requests and processing payments (and any later cancellations).  But these functions— even though important to hotels—do not transform OTCs into operators of hotels.  Indeed, "[w]e would not say that when a hotel contracts with a cleaning service that orders supplies and hires, schedules, and pays workers, the cleaning service becomes an operator of the hotel." *Village of Bedford Park v. Expedia, Inc.*, 876 F.3d 296, 304 (7th Cir. 2017) (applying the ordinary meaning of "operator").

**¶50**        The majority accepts the above-cited definitions but is persuaded to give § 444 a more expansive meaning in light of MCTC § 447, which provides:

> In addition to the taxes levied as provided in [§ 444], there is hereby levied and shall be collected an additional tax in an amount equal to ___ percent (___%) of the gross income from the business activity of any hotel engaging or continuing within the City in the business of charging for lodging and/or lodging space furnished to any transient.

According to the majority, because the MCTC drafters "used specific language to limit the additional tax liability of § 447 to the gross income of 'hotels,'" and chose not to do so in § 444, the drafters must have intended that "the tax liability of § 444 extends beyond the hotels' owners and operators." *See supra* ¶ 16.  It then concludes that § 444 broadly applies to anyone who "engages for profit in business activities that are central to keeping brick-and-mortar lodging places functional or in operation." *See supra* ¶ 18.  I disagree for several reasons.

---

[8] The majority dismisses these cases because the statutes at issue applied to "operators" (*Pitt County*) and "owners or operators" (*Mont. Dep't of Revenue*) while § 444 applies to persons engaged in "the business of operating a hotel." *See supra* ¶ 15.  This razor-thin semantic distinction is meaningless.  Both cases gave plain meaning to what it means to "operate" a hotel, which is the issue here.  Regardless, I rely primarily on the same dictionary definitions of "operate" and "operation" used by the majority. *See supra* ¶ 18.

**¶51** First, the majority misapprehends § 447, which leads it to misinterpret § 444. Section 447 does not identify the taxpayer as "hotel owners and operators" by referring to "any hotel," as the majority asserts. *See supra* ¶ 17. "Any hotel" does not identify the taxpayer but instead describes, in part, the calculation for the additional tax. *See* MCTC § 447 (setting the tax as a percentage of "the gross income from the business activity of any hotel"). A brick-and-mortar hotel is not a taxpayer; only individuals and entities are taxpayers. *See* MCTC § 100 (defining "taxpayer" as "any person" liable for privilege taxes and defining "person" as individuals, legal entities, and government); *see also* MCTC § 300 (confining transaction privilege and use tax licensing requirements to "person[s]").

**¶52** The taxpayer required to pay the additional tax required by § 447 is the same taxpayer identified in § 444— "every person engaging or continuing in the business of operating a hotel." No other taxpayer is identified in § 447. By providing that the taxes are "[i]n addition to" the taxes levied by § 444, the provision is most reasonably interpreted as imposing additional taxes on the taxpayer identified in § 444. This interpretation is further supported by considering that § 447 is an optional "add on" for cities to impose additional taxes on hotel revenues that can be dedicated to specific uses. *See* MCTC § 447. For example, the City of Scottsdale imposes a 1.75% tax under § 444 to defray general city expenses and imposes a 5% tax under § 447 to be used for tourism-related purposes. *See* Scottsdale Revised Code, Appendix C, Transaction Privilege & Use Tax Code, §§ 300, 444, 447. Also, although § 447 does not repeat § 444's tax exclusions, the Arizona Department of Revenue applies those exclusions to § 447 taxes, thereby demonstrating the department's view that § 447 is an "add on" to § 444. *See Arizona Tax Matrix for Hotel/Motel Lodging Industry*, Ariz. Dep't of Revenue Tax Ruling TPR 06-1, https://azdor.gov/sites/default/files/RULINGS_TPT_2006_tpr06-1-matrix.pdf. ("TPR 06-1") (applying §§ 444 and 447 taxes to the same revenue sources); *see also Scottsdale Healthcare, Inc. v. Ariz. Health Care Cost Containment Sys. Admin.*, 206 Ariz. 1, 8 ¶ 27 (2003) (noting that agency interpretation of a statute is given weight). Finally, this interpretation of § 447 aligns with all other MCTC privilege tax categories, which impose tax liability on persons or entities "engaging or continuing in" particular businesses. *See* MCTC art. IV.

¶53        In sum, the same taxpayers are liable for taxes imposed by §§ 444 and 447.  The majority therefore errs by concluding that §§ 444 and 447 apply to different taxpayers and then defining the § 444 taxpayer more expansively in a misguided attempt to distinguish § 447.

¶54        Second, by interpreting § 444 as taxing the gross income of anyone who "engages for profit in business activities that are central to keeping brick-and-mortar lodging places functional or in operation," then sweeping OTCs into that category, the majority necessarily imposes the tax on persons and entities no reasonable person would conclude engage in "the business of operating a hotel."  For example, as the Cities acknowledged at oral argument here, the majority's interpretation means airlines, credit card companies, brick-and-mortar travel agents, and others who offer hotel booking services for a profit and accept payments directly from customers also "operat[e] hotels" and must now secure privilege tax licenses and pay taxes in every city in which they book hotel rooms and collect payment directly from customers.  The majority agrees.  It points out that hotels currently pay taxes on the full amount paid directly to them by customers, even though some portions are later remitted to brick-and-mortar travel agents and credit card companies (e.g., American Express Travel) as service fees.  *See supra* ¶ 21.  That is also what occurs when customers directly pay hotels in full upon arrival for an OTC-booked room and amounts are remitted to OTCs.  But although *hotels* remit taxes on customer payments representing OTCs and brick-and-mortar travel agents' fees and commissions—not an issue here—*agents and credit card companies* have not paid privilege taxes when they have directly collected their fees and commissions from customers when booking.  The opinion today changes the status quo and requires these agents, credit card companies, and others to secure licenses and pay municipal taxes for the privilege of "operating hotels."

¶55        The majority's broad interpretation also means that third-party entities who provide maintenance, housekeeping, gardening and like "central" services to hotels are now also subject to taxation under § 444— surely an unintended result under the MCTC.  The majority attempts to side-step this result by limiting "central" services to those "essential" to furnish lodging, presumably reservations, payment processing, and front-desk operations, and then concluding that services like housekeeping do

not fit within that definition.[9]  *See supra* ¶¶ 18, 21.  My colleagues in the majority would presumably (and hopefully) consider the fresh sheets placed by housekeeping on their hotel room beds to be "essential" to their lodging.  Regardless, the MCTC provides that "lodging" includes not just a hotel room but "the furnishings or services and accommodations" accompanying it, meaning § 444 applies to a broader category of business activity than the majority credits.  *See* MCTC § 100 (defining "lodging").  Indeed, the Arizona Department of Revenue maintains that items such as onsite childcare and hotel-arranged transportation are taxable under § 444.  *See* TPR 06-1.

**¶56**          Third, at a minimum, § 444's applicability, when considered in context with § 447, creates an ambiguity about the identity of the taxpayer subject to § 444.  Ambiguities in tax provisions are construed "liberally in favor of the taxpayer and strictly against the state."  *See Ebasco Servs. Inc. v. Ariz. State Tax Comm'n*, 105 Ariz. 94, 97 (1969); *see also City of Peoria v. Brink's Home Sec., Inc.*, 226 Ariz. 332, 333 ¶ 6 (2011) ("We read tax provisions 'to gain their fair meaning, but not to gather new objects of taxation by strained construction or implication.'" (quoting *Ariz. State Tax Comm'n v. Staggs Realty Corp.*, 85 Ariz. 294, 297 (1959))).  This principle further confirms that § 444 applies no more broadly than does § 447.

**¶57**          The majority is also persuaded to apply § 444 to OTCs because otherwise "illogical and unjustifiable tax consequences" would occur depending on whether an OTC-customer directly paid a hotel (paying more tax) or paid the OTC (paying less tax).  *See supra* ¶ 26.  But a municipal privilege tax is an excise tax on the privilege of doing business; it is not a sales tax on customer transactions.  *See Ariz. Dep't of Revenue v. Mountain States Tel. & Tel. Co.*, 113 Ariz. 467, 468 (1976) (noting that a state privilege tax "is an excise tax on the privilege or right to engage in an occupation or business in the State of Arizona").  Thus, it is not "illogical or unjustifiable" to tax only the gross income of persons privileged to operate hotels in the taxing cities rather than tax the total amount paid by the hotel guest.  Any inequity—a windfall to the cities or a disadvantage to the hotel operators—

---

[9] The majority also asserts that such entities are distinguishable because they are not "brokers."  *See supra* ¶ 21.  That is irrelevant.  Third-party companies that provide housekeeping and the like are "persons" under the MCTC and thus subject to taxation under § 444 if they engage in the operation of hotels.

is a matter of policy that should be left to the MCTC drafters, not this Court. *Cf. Pitt County*, 553 F.3d at 314 (the potential for a tax loophole "does not compel a broader interpretation" of the code's language); *Louisville/Jefferson Cty. Metro Gov't v. Hotels.com*, *L.P.*, 590 F.3d 381, 388–89 (6th Cir. 2009) (refusing to entertain loophole hypotheticals and pointing out that the legislature, "not the court, is the proper entity to close any such potential loophole."). In fact, after the imposition of the taxes at issue here, the legislature addressed taxation of persons and entities engaging in "the business of operating an online lodging marketplace." *See* A.R.S. § 42-5076(A); *see also* A.R.S. § 42-6009 (delineating circumstances in which a city can tax an online lodging marketplace).

¶58 For these reasons, I disagree with the majority's interpretation of § 444 and its application to OTCs. Because § 447 is also inapplicable to OTCs, I would reverse the tax court's judgment and remand for entry of judgment in the OTCs' favor. I respectfully dissent.